LUDVIGH v. AMERICAN WOOLEN CO. OF NEW YORK et al.

(Circuit Court of Appeals, Second Circuit. May 8, 1911.)

No. 194.

BANKRUPTCY (§ 140*)—PROPERTY PASSING TO TRUSTEE—GOODS DELIVERED TO BANKRUPT—SALE OR BAILMENT.

By the contract between a woolen company and a corporation organized for the purpose, which virtually represented bankrupts, who were dealers in woolens, it was agreed that the company should deliver goods to the corporation, title to remain in the company until they were sold. The corporation agreed to sell the same, collect the proceeds, and pay the same over to the company at once, less the difference between the invoice and selling price. By a following clause it further agreed to pay the invoice price for any goods not "accounted for" under the preceding clause. *Held*, that such agreement did not bind it to pay for goods unsold, but only such as were sold and the proceeds not paid over or accounted for; that the contract was not one of sale, by which the title passed to the bankrupts, and later to their trustee, but of consignment or factorage, or at most of conditional sale, which was valid as against the creditors of the bankrupts.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

Lacombe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Bill by Clifford J. Ludvigh, trustee, against the American Woolen Company of New York and the Niagara Woolen Company. Decree (176 Fed. 145) for complainant and defendants appeal. Reversed.

Hays, Hershfield & Wolf (Daniel P. Hays, of counsel), for appellants.

James, Schell & Elkus (A. I. Elkus, Garrard Glenn, and James N. Rosenburg, of counsel), for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

WARD, Circuit Judge. November 15, 1901, P. Horowitz & Co. entered into a written contract with the American Woolen Company, to run to December 1, 1902, whereby the Woolen Company agreed to consign goods to Horowitz & Co., the title to the goods or their proceeds to remain in the Woolen Company until fully accounted for, all bills for the consigned goods to be made payable to the Woolen Company, and Horowitz & Co. to receive as their compensation the difference between the invoice and selling prices (which were not to be less than the invoice) and to be allowed a drawing account of $1,200 a month to be deducted from their profits. They were also to give security by way of a lien upon real estate to protect the Woolen Company against loss by reason of any failure on their part to observe the agreement. It was also provided that Horowitz & Co. were not to *buy* woolens of any one but the Woolen Company. This word, read in connection with the whole agreement, must be understood as meaning to deal with no one else. If it be given the literal construc-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tion of purchasing, then the sale to them was not an absolute, but a conditional, sale.

The Woolen Company, apparently because it entertained suspicions of Horowitz & Co., and perhaps, also, because its counsel misunderstood the decision of this court in Re Garcewich, 115 Fed. 87, 53 C. C. A. 510, declined to continue the contract and required that the business should be done thereafter through a corporation. Such a corporation was formed under the name of the Niagara Woolen Company "to contract and deal with the American Woolen Company of New York and to deal in fabrics received therefrom." November 25, 1902, an agreement was executed between the American Woolen Company and the Niagara Woolen Company whereby the former agreed to consign goods to the latter for one year on substantially the same terms as contained in the agreement of November 15, 1901, with Horowitz & Co. The capital of the company was $20,000, in 200 shares, of $100 each, 195 of which were issued to Philip Horowitz in consideration of a mortgage of $19,500 on certain real estate, being the same security mentioned in the former agreement.

On the same day an agreement was executed by the American Woolen Company, of the first part, Horowitz & Co., of the second part, and J. P. Murphy, of the third part, whereby Horowitz & Co. guaranteed the faithful performance of the contract by the Niagara Company, and Philip Horowitz as security transferred 195 shares of that company's stock to Murphy, in trust to vote the same for such person as president of the Niagara Company as Horowitz & Co. should designate, and in case of failure of the Niagara Company or of Horowitz & Co. to perform their covenants, respectively, to transfer the stock to the American Woolen Company. The American Woolen Company elected Joseph Horowitz president and one of its own employés treasurer of the Niagara Company and a by-law was adopted requiring all checks on the funds of the company to be signed by the president and treasurer jointly. The Niagara Company had an office on the premises of Horowitz & Co. and a sign on the outside door. Subsequently the American Woolen Company also employed a bookkeeper, who kept an account of all its goods billed to the Niagara Company and of all sales and payments reported by the Horowitzes. The goods were sold in the name of the Niagara Woolen Company and the proceeds of sale deposited in its bank account.

The business was carried on strictly in accordance with the agreement of November 25, 1902, until May, 1904, when Joseph Horowitz withdrew from all participation in the business of Horowitz & Co., which was continued by Philip Horowitz, who also became president of the Niagara Company. He soon began to embezzle the funds of the Niagara Company by indorsing checks received by him to its order in its name and depositing them in the bank account of Horowitz & Co. October 26th a very suspicious fire occurred on the premises, Philip Horowitz fled the country, and has not been heard of since. On or about October 26th the American Woolen Company removed from the premises of Horowitz & Co. 760 pieces of goods consigned to the Niagara Company. October 31st a petition in bankruptcy was

filed against Horowitz & Co., followed January 26, 1905, by an adjudication.

July 17, 1907, the trustee in bankruptcy filed this bill in the District Court against the American Woolen Company and the Niagara Woolen Company, praying that the agreements of November 25, 1902, above mentioned, and the removal of the said goods, might be declared void under the bankruptcy act as in fraud of the creditors of Horowitz & Co., and that the defendants might be decreed to deliver the woolens removed by the American Woolen Company, or their value, $39,685.27, to him, and also to pay over to him the proceeds of woolens sold, to the amount of $25,000, paid to the American Woolen Company within four months of the filing of the petition in bankruptcy, with interest from October 26, 1904.

A demurrer to the bill having been overruled, the defendants answered, denying all the charges of fraud, and praying that the bill be dismissed, with costs. The learned judge below found that there was no actual fraud on the part of any one connected with the agreements; that they were made under the advice of counsel to protect the American Woolen Company against danger in doing business with Philip Horowitz, and were good inter partes. But he held that the American Woolen Company was at the same time trying to get the privileges of a bailor and the rights of a vendee, and that the contract must be treated as against the creditors of Horowitz & Co. as an absolute sale. He disregarded the Niagara Woolen Company entirely. His conclusion that the transaction was a sale is in large part founded on the following clauses in the agreement between the American Woolen Company, of the first part, and the Niagara Woolen Company, of the second part:

"IV. Said party of the second part agrees to sell such merchandise to such person or persons as they shall judge to be of good credit and business standing, and to collect for and in behalf of the party of the first part all bills and accounts for the merchandise so sold, and to immediately pay over to the said party of the first part any amount collected as aforesaid immediately upon its collection, minus, however, the difference between the price at which said merchandise so collected for has been invoiced to the party of the second part and the price at which said merchandise has been sold as aforesaid by the party of the second part.

"V. Said party of the second part hereby guarantee the payment of all bills and accounts for merchandise, possession of which is delivered to it under this agreement; and it hereby agrees, in case any merchandise delivered under the provisions of this agreement by the party of the first part to the party of the second part is not accounted for to the party of the first part, under the provisions of clause IV of this agreement, to pay to the party of the first part the invoice price of said merchandise, and thereupon title to said merchandise, or the proceeds thereof, so paid for shall pass to the party of the second part, and shall then be exempted from the provisions of this agreement."

Upon this subject he says:

"It is to be observed that this document requires the Niagara Company to pay the invoice price of the merchandise delivered to it unless it accounts for the same *under the provisions of clause 4*'; but clause 4 contains, as above set forth, a specific agreement on the part of the Niagara Company to sell the merchandise and pay over to the Woolen Company the sale price thereof, less the difference between such price and the invoice value. It fol-

lows that, if the Niagara Company could not account to the Woolen Company for money by selling the goods, it was nevertheless bound to pay the invoice price, and (continues the written agreement) 'thereupon title to said merchandise * * * so paid for shall pass to the Niagara Company.'"

But clause IV plainly refers to accounting for goods sold by the Niagara Company, and we think the merchandise "not accounted for to the party of the first part under the provisions of clause IV" means merchandise sold. Merchandise on hand would be accounted for by the fact that it was on hand. This appears clearly from the provisions of clause VIII:

"VIII. This agreement shall continue for one year. If, for any reason, this agreement terminates, all of the merchandise, possession of which is held by the party of the second part under this agreement, shall at said termination be immediately returned to the possession of the party of the first part."

The purpose of this clumsy interposition of the Niagara Company was, as counsel for the American Woolen Company points out, that it should be a sort of cash box for the Woolen Company and check on the transactions of Horowitz & Co. Though there are some inconsistencies in the language of the agreements and in the correspondence between the parties, we are clearly of the opinion that it was their purpose honestly to make a consignment or factorage agreement. The goods were to be sold by Horowitz & Co. at not less than the invoice price, and the proceeds were to be turned over at once to the American Woolen Company. The transaction, regarded either as a consignment or as a conditional sale of Horowitz & Co., was entirely legal as against their creditors. Such agreements are valid notwithstanding that credit may sometimes be given to a factor or to a conditional vendee because of his apparent ownership of property in his possession, though in this case there is no evidence whatever of any such thing. Contracts of sale under which title is to remain in the vendor, although the vendee may consume the goods or sell them and apply the proceeds to his own use, are fraudulent as to creditors, because the stipulation that title is to remain in the vendor is entirely inconsistent with the purpose of the contract. In re Garcewich, supra: In re Penny & Anderson (D. C.) 176 Fed. 141.

The agreements which we have had under consideration are contracts of an entirely different character and contain elaborate provisions to prevent the consignee from consuming the goods or selling them and applying the proceeds to their own use.

The decree is reversed, with costs out of the estate, but not against the trustee personally.

LACOMBE, Circuit Judge (dissenting). The construction of clauses IV and V adopted by the District Judge seems to me to be the correct one, and, concurring in his reasoning and conclusion, I dissent from the opinion of the majority of this court.