### TAYLOR v. FRAM et al.

(Circuit Court of Appeals, Second Circuit. June 7, 1918.)

No. 142.

1. FACTORS ⇐⇒18—TITLE TO GOODS—"SALE."

Ordinarily, where a person receives property which he is not bound to return in the identical form, but may account therefor in money or other property, the transaction amounts to a "sale"; but this rule is not applicable to consignments to sell, where the owner of a chattel delivers it to an agent to sell, in which case the title remains in the principal or bailor, though possession is transferred to the agent or bailee.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale.]

2. BANKRUPTCY ⇐⇒140(3)—CONSIGNMENT FOR SALE—ADVERTISING RELATION.

Though the bankrupt did not advertise himself as an agent, or in any way indicate that he was selling goods on consignment, that fact does not affect the rights of the owner, who consigned goods to the bankrupt for sale.

3. BANKRUPTCY ⇐⇒140(3)—RIGHTS OF TRUSTEE—SALE OF GOODS ON CONSIGNMENT.

Though by written agreement of the parties goods were consigned to the bankrupt for sale, yet, where the parties treated the transaction as

one of actual sale, and the bankrupt was not required to account for the proceeds as provided in the contract, *held*, that the consignors were liable for goods which they retook on the eve of bankruptcy, for the written agreement could not be invoked as against the trustee in bankruptcy.

Appeal from the District Court of the United States for the Eastern District of New York.

Suit by Louis M. Taylor, as trustee in bankruptcy of Charles Epstein, bankrupt, against Isidor Fram, and others. From a decree for plaintiff (243 Fed. 733), defendants appeal. Affirmed.

This suit is brought by the trustee of the bankrupt to have a certain agreement made between the bankrupt and defendants declared fraudulent and void as against creditors, and that defendants be adjudged to hold in trust certain merchandise delivered to them by the bankrupt, and that they be required to make delivery thereof to the trustee or pay him the value thereof. The defendants were copartners conducting a number of retail shoe stores in the borough of Brooklyn, New York City. They traded under the name of the Boston Shoe Market. They were accustomed to purchase stocks from persons who desired to retire from business, and they were continuously buying and selling shoe stores. They would buy a store and hold a special sale therein, and then close the store and remove the goods which remained to what they called their main store, which was in Brooklyn. They also purchased merchandise from various manufacturers and jobbers.

The bankrupt, Charles Epstein, is a brother of the defendant Epstein, and a brother-in-law of the defendants Snitzer and Fram. In December, 1914, Charles Epstein opened a retail shoe store in Brooklyn. In the beginning he purchased part of his stock from time to time from the defendants; defendants having limited him at the time to $100 credit. In May, 1915, he owed defendants $330.11, and they then refused to extend any further credit to him. Thereupon he asked them to consent to give him an agency and allow him to sell on their account. They consulted their attorneys, and inquired whether they could do so and secure themselves in that manner, without jeopardizing themselves or without giving the bankrupt any credit, as they were unwilling to extend any credit to him. An agreement was drawn by the attorneys, which in substance provided that, from and commencing with the date, all merchandise thereafter shipped to Charles Epstein was to be the property of the defendants; that the merchandise which he should sell should be sold as agent of the defendants only; that such merchandise was to be designated when shipped to the said Charles Epstein on memorandum statements, or bills; that Charles Epstein was not to sell any of the merchandise for less than the price stipulated on the statement, which sum he was to refund or pay over to the defendants on Monday of each and every week for all merchandise sold during the week; that he was to render an account or a statement whenever requested; that upon demand he was to return and deliver to defendants all the merchandise, delivered to him under the agreement, in his possession; that in no sense was the agreement to be so construed as to vest any interest in Charles Epstein as to the merchandise delivered to him, but that the title was at all times to remain in the defendants; that none of the provisions of said agreement were to be changed or altered unless it be expressed in writing; and that all future business relations between the defendants and Charles Epstein were to be governed exclusively by the provisions in the agreement.

This agreement, dated May 27, 1915, was signed by Charles Epstein as party of the first part and by the Boston Shoe Market, Isadore Snitzer, Isador Fram, Albert Epstein, parties of the second part, by Isadore Snitzer. It is this agreement which the trustee alleges to be part and parcel of a device to hinder, delay, and defraud creditors. He alleges that in fact and in truth no agency was created between the bankrupt and the defendants, but that the merchandise mentioned in the agreement was actually sold by defendants to the bankrupt, and that the latter was indebted to defendants

therefor. After this agreement was made the bankrupt was in the habit of going to defendants for shoes when needed. Bills were delivered with the merchandise, which did not indicate that the goods were on consignment. Under the agreement the invoices were to contain a memorandum of the price for the merchandise, and they were not to be sold at less than that price. This price was not the selling price, because that was fixed by the bankrupt, but was the cost price to the bankrupt. No stock record was ever kept by either the bankrupt or the defendants. The bankrupt, however, testified that he had a record, which showed the number of pairs of shoes that he received from the defendants, and that he had "a separate little book, five-cent copy book," in which he had an account of every pair that was sold. There was contradictory evidence as to whether defendants shipped their goods to the bankrupt, marked so that they should be distinguished from his own stock. The bankrupt testified before the commissioner that the goods were shipped to him unmarked, and that he always marked them B. S. M. (which stood for Boston Shoe Market). In the court below he testified that when he received the goods they came with B. S. M. on them and the cost mark, and that defendants put them on. When his attention was called to his contradictory statement before the commissioner, he said some came marked and some unmarked, and that he himself then put the marks on the corners of the boxes which were unmarked, and that he marked them in letters too small for anybody else to see. The defendants claimed they put the marks on by their bookkeeper, and that individual was not produced at the trial.

The bankrupt, instead of paying on the Monday of each week and every week as the agreement provided, kept the moneys realized from the sale of the property consigned and mingled them with his own funds, and only made remittances when requested to do so; and when remittances were made they were made on account, and they were all in even amounts, as $25, $35, or $50. When payments were made by check no receipt was given, and at no time were the remittances accompanied by any list of the goods sold. The bankrupt dealt with and represented the goods as his own. The photographic copy of the defendants' ledger shows that the relation was regarded as that of debtor and creditor. On the day before the assignment for the benefit of creditors the bankrupt and the defendants had a meeting, at which the bankrupt's financial condition was discussed, and at which the defendants were informed that the bankrupt was insolvent. This condition was ascertained by an inventory taken six days prior to the assignment. At that time the bankrupt had goods worth $1,600 or $1,700. On the day prior to the assignment the goods were shipped back by the bankrupt, who himself packed the goods and hired the truck. A moving van load of goods was sent to defendants, including the cash register. The goods left in the bankrupt's store consisted of mismated and unpacked stock, which at cost was worth only $543.21. The trustee claimed in the court below that the defendants received merchandise to an amount in excess of $1,000. The defendants failed to enter in their books the credit for the goods returned. The books were produced at the trial one year after the goods were returned and they contained no credit for the merchandise returned.

The District Judge has found that the agreement of May 27, 1915, was fraudulent and void as against the complainant and the creditors of the bankrupt, and was intended to hinder, delay, and defraud the creditors, and no agency was created between the bankrupt and defendants, and the legal title to the merchandise was vested in the bankrupt, and that the latter was on January 18, 1916, when he was adjudicated a bankrupt, indebted to defendants in the sum of $429.73. He has accordingly decreed that the complainant recover that sum from defendants, with interest from January 18, 1916, besides the costs and disbursements of the action.

L. & M. Blumberg, of Brooklyn, N. Y. (Leopold Blumberg, of Brooklyn, N. Y., of counsel), for appellants.

Samuel J. Rawak, of New York City, for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The question which this appeal presents makes it necessary for this court to determine what the exact relationship was that existed between the bankrupt and the defendants at the time Charles Epstein was adjudicated a bankrupt. If Epstein was the agent of the defendants, he was a bailee of the goods of the defendants, and the latter had a right to receive them back from him, in the manner they did. In that event we should be obliged to hold that the court below committed reversible error. If, on the other hand, the real relationship was that of vendor and vendee, the bankrupt being in reality a vendee, and not a bailee of defendants, no error was committed, and the decree must be affirmed.

[1] The general rule, of course, is that where a person receives property which he is not bound to return in the identical form in which he receives it, but may account therefor in money or other property or thing of value, the transaction amounts to a sale, and not to a bailment. But this rule is not applicable to consignments for sale; the law being that the owner of a chattel may consign it or deliver it to an agent for sale without creating the relation of vendor and vendee between the parties. In re Smith (D. C.) 192 Fed. 574; 6 C. J. 1091. In a sale title passes to the buyer, while in an agency or bailment title remains in the principal or bailor, although possession is transferred to the agent or bailee.

[2, 3] The defendants insist that they were bailors, and not vendors, and they rely upon Ludvigh v. American Woolen Co. of New York, 231 U. S. 522, 34 Sup. Ct. 161, 58 L. Ed. 345. That case holds that a contract under which goods are delivered by one party to another, to be sold by the latter and proceeds paid to the former, less an agreed discount, the unsold goods to be returned to the consignor, is a contract of bailment only, and the consignor can, in the absence of fraud, take them back in case of the consignee's bankruptcy. That case was an affirmance of the decision which this court made in the same case. 188 Fed. 30, 110 C. C. A. 180.

If the agreement into which the bankrupt and defendants in the case at bar entered on May 27, 1915, and upon which they rely, was made in good faith, and if the business was carried on in accordance with it, there is, of course, no doubt that this case would be governed by the rule announced in Ludvigh v. American Woolen Co., supra, and the decree entered below would have to be reversed. The agreement of May 27th seems to have been drawn skillfully and with the terms of the agreement in the Ludvigh v. American Woolen Co. Case in mind. It provides (1) that all merchandise delivered to the bankrupt shall, at all times, be the property of the defendant; (2) that he shall sell the merchandise at retail as their agent, and in that capacity only; (3) that the price for the merchandise shall be designated on certain signed statements and memorandum bills; (4) that the bankrupt shall not sell for less than the amount therein stipulated; (5) that any excess retained shall not be retained by the bankrupt for his services; (6) that the bankrupt shall account for all the moneys received by him weekly and pay over same to the defendants; (7) that the defendants

shall be at liberty at all times to demand the return of the merchandise on hand; (8) that nothing in said agreement shall be construed as vesting any title in the bankrupt; (9) that nothing in said agreement shall be changed or altered unless it be in writing; (10) that all business relations between the bankrupt and the defendants shall be governed absolutely and entirely by the provisions in said agreement contained.

There are numerous cases which may be cited to show that such an agreement creates a bailment, and not a sale, and that the bailor is at liberty at any time to retake his merchandise, irrespective of whether bankruptcy proceedings intervene or whether the debtor is solvent or not. All this we concede, and no citation of authorities is necessary. But the above doctrine only applies where the agreement is entered into in good faith, and without intent to hinder, delay, or defraud creditors. In the Ludvigh Case all the courts agreed that there was no actual fraud in the transaction. In the case at bar the District Judge was convinced that there was a lack of good faith in the making of the original contract. He also found that the business was not carried on in accordance with the agreement, and that the consignor had so acted upon the breach as to show, with respect to future consignments, that title passed in the transactions and that they were sales and not bailments.

The District Judge in his opinion attached importance to the fact that the bankrupt did not advertise himself as an agent, nor have any sign to show that he was selling goods on consignment. We know of no rule of law which makes it incumbent upon one who receives goods upon consignment to sell that he should advertise the fact of his agency to his customers; and we do not attach any importance to the nondisclosure by the bankrupt that he received the goods in his capacity as an agent. We nevertheless concur in the conclusion which the District Judge reached that the bankrupt held the title to these goods, and was indebted for the same to the defendants, that he had no right to return the goods to them, and that they must pay to the complainant their value as decreed.

If the bankrupt had given the defendants a mortgage upon the stock in his store, and had been permitted to sell the stock covered by it and to deposit the moneys received in his general account, and use them to meet his liabilities as if no mortgage existed, instead of paying them over to the mortgagee, we should be obliged to hold that the mortgage was fraudulent as against the trustee in bankruptcy. Southard v. Benner, 72 N. Y. 424, 429; Haugen v. Hachemeister, 114 N. Y. 566, 570, 571, 21 N. E. 1046, 5 L. R. A. 137, 11 Am. St. Rep. 691. If that be so as to a mortgage of record, and of which creditors have constructive notice, it should follow a fortiori that an agreement of which creditors have no constructive notice, which reserves title to the consignor, who nevertheless and contrary to its terms permits the consignee to make sales, and deposit the proceeds of sales in his general bank account, and use them for his own purposes, is equally fraudulent as against the trustee.

The nature of the transaction in which these parties engaged is not to be determined from the written agreement which they made, for they did not keep it. It is more important to know what they did than it is to know what they agreed they would do, for the purpose of the writing may well have been to conceal from creditors the real nature of the transaction. We do not need to concern ourselves about the writing, for we are forced to conclude that it was not made to be kept. No attempt was made to keep it. The bankrupt, who was to make returns each Monday, testifies that he never made a return showing what consigned goods he had sold, or how much of the consignment he still had on hand, and defendants never demanded any such statement from him. He failed to live up to his contract of agency from the very beginning, and has acted throughout as a purchaser of the goods consigned to him. This he has done with the full acquiescence of the defendants. Prior to the so-called agreement it is admitted that the bankrupt and defendants dealt with each other as vendors and vendee. After the agreement the bankrupt admits that he fixed the price of the shoes sold. He testifies that he sold them at any price he wanted to, although the paper agreement provided that he was not to sell for less than the price fixed by the defendants. When he sent defendants any money, he did not accompany it with any statement as to the goods which he had sold, but paid in so much on account. It was his habit to take the daily receipts of all sales made at his store and deposit them in his bank account, which contained the moneys realized from his general sales of defendants' stock and everybody else's stock. The bankrupt's testimony that the cartons received had been marked either by himself or the defendants is contradicted flatly by a dealer, who was selling him goods and carefully examined the boxes, and testified that there were no initials on the front of any of the cartons in any part of the store.

If it be said that what was done was contrary to the agreement, the answer is that the defendants by their conduct permitted the agreement to be ignored. They knew that the bankrupt was not accounting to them on the Monday of each and every week for the moneys he had received from the sale of their merchandise. They knew that he was paying them by checks drawn on his general account, and, if they did not know, they certainly took no pains to find out, whether he was using their moneys, which they knew had gone into his general account, in the payment of other claims than theirs. Under the circumstances, we do not think the defendants are in a position to invoke the written agreement as against the trustee. They cannot now come into court to set up that agreement to shield them in the retention of the property which was surrendered into their possession by the bankrupt, who took practically everything of value which the store contained, not overlooking the cash register. The law has no sanction for such a proceeding.

Judgment affirmed.