## Milk Factors

BARD, Attorney General, December 12, 1938.—Receipt is acknowledged of your recent inquiry, wherein you request our opinion as to the legality of a certain purported agreement between milk dealers and milk producers, and whether the Milk Control Law or orders of the Milk Control Commission issued thereunder are applicable to said agreement.

The purported agreement may be summarized as follows: The milk dealer, described in the agreement as a "factor", agrees to accept on consignment, for the purpose of processing and selling, any milk so consigned by producers. It is recited that the producer retains title to the milk, and reserves the right to take it back if he desires, although the "factor" is authorized to mix such milk with that of any other producer. The "factor" agrees to collect from ultimate purchasers for all milk sold, and to remit to the producer a stipulated amount out of the proceeds of such sales, guaranteeing the payment of such amount. The final two clauses of the agreement read as follows:

"10. It is hereby definitely understood that this is an offer to receive on consignment for sale, and not an offer to buy milk from producers, and on and after the effective date hereof no milk shall be received by this dairy except on consignment.

"11. Any producer who shall ship milk to the aforementioned dairy on or after October 1, 1938, shall be deemed to have accepted this offer, and to be acting in accordance with the terms hereof. This agreement, completed by acceptance as above, shall remain in full force and effect until altered, amended or cancelled by either

party giving ten (10) days' written notice to the other of his intention so to do."

There is no doubt that this contract purports to be a consignment arrangement rather than a contract to buy and sell.

## I

Apparently the milk dealers who are requiring their producers to enter into such an arrangement contemplate that the Milk Control Law of April 28, 1937, P. L. 417, does not apply to milk consigned by producers to "factors", but only to milk sold to milk dealers. This position is untenable. The Milk Control Law, sec. 103, defines a milk dealer as follows:

" 'Milk dealer' means any person, including any store or subdealer, as hereinafter defined, who purchases or *handles* milk within the Commonwealth, for sale, shipment, storage, processing or manufacture, within or without the Commonwealth." (Italics supplied.)

It is significant to note that a milk dealer need not be one who "purchases" milk for sale, but may be one who "handles" milk for sale, including "factors".

In The Robin Gray, 53 F.(2d) 1037 (1931), at 1041, it is held:

"A 'factor' is repeatedly defined as an agent employed to sell goods for a principal. Bouv. Law Dict. (3d Revision), vol. 2, p. 1176; Words and Phrases, Third Series, vol. 3, p. 496; In re Gulick (D. C.) 186 F. 350, 351."

See also 25 C. J. 340, and Commonwealth v. Shober, 3 Pa. Superior Ct. 554 (1897).

It is clear that in the present case the mere labeling of the milk dealer as a "factor" does not make him such. The agreement itself recites that the "factor" is receiving the milk "for the pupose of processing, selling, and distributing." These are not the functions of a factor, but of a milk dealer (although nothing prevents a factor from performing such functions).

Under section 301 of the Milk Control Law, the Milk Control Commission is given authority which extends far

beyond mere agreements to buy and sell milk, it being vested with authority to "regulate the entire milk industry of this Commonwealth, including the production, transportation, disposal, manufacture, processing, storage, distribution, delivery and sale of milk and milk products in this Commonwealth".

Furthermore, section 801 of the Milk Control Law authorizes the Milk Control Commission to "maintain such prices for milk", and to issue orders "fixing prices to be charged or paid for milk". Section 803 provides as follows:

"The commission shall fix, by official order, the minimum prices to be paid by milk dealers to producers for milk: Provided, however, That the fixing of prices to be paid by milk dealers to producers for milk to be used solely in manufacturing shall be discretionary with the commission."

Nothing in these grants of authority limits the jurisdiction of the commission to contracts to buy and sell; the express authority is with respect to "prices to be paid". See also section 806, in which the commission is given authority to fix "the terms upon which milk dealers shall pay producers and others for milk".

True it is that section 807 specifies that it is "unlawful for a milk dealer or producer to sell or buy, or offer to sell or buy, milk at any price below the minimum price"; but this does not limit violations of the Milk Control Law to contracts of sale or purchase. Under sections 801 and 803 the important thing is the price paid to the producer, not the device, form, or agreement by which the price is paid. This is rendered still clearer by the following paragraph of section 807:

"It shall be unlawful for any milk dealer to sell any milk for which he has paid, or agreed to pay, a price lower than that fixed by the commission for milk of that class or grade."

Thus, the deciding factor is whether this agreement results in the milk dealer paying below a lawful price for

the milk, rather than whether the agreement for such payment is a consignment arrangement as distinguished from a contract of purchase.

The word "price" is generally used in connection with agreements to buy and sell; however, any standard dictionary will show that the word may also be used synonymously with "sum", "value", or "worth". To this effect see especially 49 C. J. 1344, and Paul, Admr., et al., v. Grimm, Admr., 165 Pa. 139 (1895) at 143, 149. It is also often defined as 'that which must be given, done, or undergone in order to obtain a thing": Vol. 2, New Century Dictionary 1390 (1936).

That the agreement herein under consideration used the words "remit" and "proceeds" does not alter the fact that it is an agreement to pay money for milk, and as such is within the above-quoted price provisions of the Milk Control Law. We therefore conclude that the express language of the Milk Control Law authorizes the Milk Control Commission to fix prices to be paid to producers for milk, whether such payments are made by virtue of a contract of consignment or a contract of sale.

## II

Since certain official general orders of the Milk Control Commission expressly refer to the sale of milk, it becomes pertinent to examine whether the purported agreement of consignment is in fact an agreement of sale. In our opinion the answer is in the affirmative.

The so-called "factor" is actually a milk dealer receiving the milk in the usual course of his business as a milk dealer, namely, as one who buys the raw product, processes and/or bottles it, and then distributes it to the ultimate consumer. The apparent reservation to the producers of a right to take back milk is a mere subterfuge, being an agreement which is incapable of fulfillment because of the highly perishable character of milk.

Since this contract was prepared by the dealer it will be construed most strongly against him: 13 C. J. 545.

The nature of the milk industry is described in the preamble of the Milk Control Law, wherein it is pointed out that the main purpose of this type of legislation is to procure for milk producers "the cost of sanitary production". The entire business is affected with a public interest: Rohrer v. Milk Control Board, 322 Pa. 257 (1936); Carolene Products Co. v. Harter et al., 329 Pa. 49 (1938).

Under the circumstances, it is clear that the public interest cannot be defeated by the mere wording of such an agreement, if the purpose thereof is to take the transaction outside the jurisdiction of the Milk Control Commission and its orders. Yet the present agreement could not have any other purpose because it does not change the actual dealings of the parties in the slightest respect. This renders the present contract entirely distinguishable from that in The First National Bank of Elgin v. Schween, Exec., et al., 127 Ill. 573, 20 N. E. 681 (1889), wherein the purpose of the agreement was to change possession and management of the farmers' plant.

A contract will not be construed as a contract of consignment if so to do will take the transaction out of the jurisdiction of the Milk Control Law and thereby injure the public or third parties. In Commonwealth v. Crowl, 245 Pa. 554, 557 (1914), it was held:

' "It has been the policy of this State to legislate on the subject of milk and milk products. . . The known disposition of some dealers to cheat and the opportunity afforded them by the absence of some regulation of the business is the justification of such legislation under the police power."

There can be no question that if the only thing sought to be accomplished by this contract is an evasion of the Milk Control Law or any orders issued thereunder, the contract will not be construed in such manner as to give it this effect. Thus, in Hughes v. Young et al., 17 Tenn. App. 24, 37, 65 S. W. (2d) 858, it was held as follows,

with respect to a lumber contract purporting to be one of consignment:

"If, however, the course of dealing between the parties under the contract was intended to merely ostensibly but not really, be that of factor and principal, but in reality of seller and purchaser, then the true relationship would govern, regardless of the terms of the contract."

The court held admissible evidence which established that the purpose of the purported agreement of consignment entered into between the grantee of standing timber and the purchaser of manufactured lumber was to defeat a certain lien.

It has been shown time and again that courts are concerned with the logic of realities rather than mere words. Thus, in Taylor v. Fram et al., 252 Fed. 465, 469 (C.C. A., 1918), it was squarely held that a so-called consignment agreement was in fact a sale, notwithstanding its express terms, because of a lack of good faith in making the original contract. The court held as follows:

"There are numerous cases which may be cited to show that such an agreement creates a bailment, and not a sale, and that the bailor is at liberty at any time to retake his merchandise, irrespective of whether bankruptcy proceedings intervene or whether the debtor is solvent or not. All this we concede, and no citation of authorities is necessary. But the above doctrine only applies where the agreement is entered into in good faith, and without intent to hinder, delay, or defraud creditors. In the Ludvigh Case [231 U. S. 522] all the courts agreed that there was no actual fraud in the transaction. In the case at bar the District Judge was convinced that there was a lack of good faith in the making of the original contract."

Carriers with contracts have been held to be common carriers by virtue of their actual dealings, regardless of the wording of such contracts: Erb v. The Public Service Commission of Pa., 93 Pa. Superior Ct. 421 (1928).

If the present agreement is not one of purchase and sale in the usual dealer-producer relationship, it would

necessarily follow that the producer is the dealer instead of the so-called "factor"; that the producer would therefore require a milk dealer's license; that the producer would suffer the loss in case of fire or theft at the dealer's plant; that the dealer or factor is not obligated to pay for milk which he does not sell (although there is no agreement for him to return any unsold milk). Not "purchasing" milk, the dealers would not have to file a bond for the protection of producers under section 501 of the Milk Control Law. The "factor" does not even agree to make any sales. As above stated, the producers' reservation of a right to take back milk is meaningless because of its perishable character. On the whole, it is impossible, especially under the circumstances surrounding the milk industry, to construe the present arrangement as anything but a contract to buy and sell. The milk producers themselves would be most amazed to find that through this arrangement they converted themselves into milk dealers. You are, therefore, advised that the agreement under examination, if valid at all, is one of purchase and sale rather than one of consignment.

### III

The next question is whether any kind of agreement between producers and dealers, whereby a certain sum of money is paid for milk below the minimum prices of the Milk Control Commission, is legal. The producer prices which the Milk Control Commission is authorized to prescribe are minimum prices; therefore, a contract for payment of a sum above the minimum is lawful. A contract which results in a payment below the minimum is unlawful and unenforcible.

It has been squarely held with respect to contracts pertaining to milk that such "contracts relating to matters clothed or affected with a public interest are subject to the police power of the State": Eisenhart v. Pennsylvania Milk Control Board, 125 Pa. Superior Ct. 483 (1937).

Furthermore, the sale of milk procured by paying less than lawful prices is likewise a violation of the Milk Control Law under section 807, regardless of the type of contract under which such payment is made, and regardless of whether the dealer is described as a "factor", or otherwise. This section reads:

"It shall be unlawful for any milk dealer to sell any milk for which he has paid, or agreed to pay, a price lower than that fixed by the commission for milk of that class or grade."

See also section 807, condemning any "method or device" to evade the Milk Control Law.

## IV

Finally, your attention is called to clause 11 of this purported agreement, which renders it void in its inception as contrary to public policy. The clause quoted above is its own evidence of the duress attendant to the procuring of the present agreement. In Rohrer v. Milk Control Board, 322 Pa. 257, 265 (1936), it was held:

"These facts make the dairy farmer or producer dependent for his return on the use to which the dealer to whom he delivers it puts it. His commodity and the price he receives for it are so far out of his control that, as a matter of fact, his supposed freedom of contract is largely illusory and at the mercy of the dealer unless the legislature intervenes for his protection; not primarily for his benefit, but only secondarily or incidental to the main purpose of promoting the public welfare by seeing to it that an adequate supply of pure milk is available at a price reasonable to the public, the dealer and the producer."

The Court of Common Pleas of Dauphin County, in Harrisburg Dairies, Inc., v. Eisaman et al., decided September 6, 1938, held as follows:

"Milk producers are subject to fraud and imposition, and do not possess the freedom of contract necessary for

the procuring of cost of production; they suffer substantial losses, and, in the absence of governmental regulation of milk, would suffer still more."

The Milk Control Law, paragraph 4 of the preamble, states as follows:

"Milk producers must make delivery of their highly perishable commodity immediately after it is produced, and must generally accept any market at any price. . . . The producers' lack of control over their market is aggravated by the trade custom of dealers in paying weeks after delivery, keeping producers obligated to continue delivery in order to receive payment for previous sales, and permitting dealers to operate on the producers' capital without giving security therefor. Hence, milk producers are subject to fraud and imposition, and do not possess the freedom of contract necessary for the procuring of cost of production."

The wording of clause 11, to the effect that "any producer who shall ship milk to the aforementioned dairy on or after October 1, 1938, shall be deemed to have accepted this offer", is another way of saying that any producer who does not desire to be deemed as having accepted the offer shall not ship milk after said date. This is duress and compulsion within the very meaning of the language in the aforementioned cases, to the effect that producers do not have freedom of contract. Years ago it was held that economic compulsion does not constitute legal duress, but the law is otherwise today, at least with respect to the production of milk.

It is obvious that farmers to whom milk dealers may read this "agreement" are in an utterly helpless position. They have their choice of two evils: Either to discontinue shipping milk to the dealer almost overnight, in which event they are deprived of their main source of income; or to continue shipping, at least while searching for another market, in which event they automatically become bound by virtue of clause 11. The Milk Control Law and its orders are expressly designed for the purpose

of preventing milk dealers from foisting such agreements upon their producers. Where any such agreement is consummated under such circumstances, and its direct or indirect effect is to cause the producer to receive a lesser sum for his milk than the amount which the Milk Control Commission prescribes to be paid, the contract is void as contrary to public policy; and this is true whether the contract be deemed one of sale or consignment.

If, by concerted action, a number of dealers in an area are concurrently foisting this upon their farmers, such farmers would be particularly injured because probably any market they sought would be with a dealer who requested entry into a similar agreement. Such concerted action would appear to be a conspiracy in restraint of trade, contrary to the Act of March 31, 1860, P. L. 382, sec. 128, 18 PS §2451. That they acted upon a lawyer's advice would not constitute a defense: 16 C. J. 85; Weston v. The Commonwealth, 111 Pa. 251 (1885).

It is our opinion, and you are, therefore, advised:

1. That the Milk Control Law of 1937 confers upon the Milk Control Commission the power to fix the price or amount to be paid producers for milk, whether such milk is sold or consigned to milk dealers by milk producers;

2. That the agreement under discussion, although purporting to be a consignment agreement, is at the most an agreement of sale;

3. That where an agreement of sale or of consignment results in milk producers receiving less than the minimum prices prescribed by the Milk Control Commission, such agreement is in violation of the Milk Control Law and unenforcible;

4. That any purported agreement between milk dealers and milk producers which causes such producers to receive less than the minimum prices prescribed by the Milk Control Commission, to which the producer automatically becomes bound by the mere continuing to ship milk, is void as contrary to public policy.