## HUGHES v. YOUNG et al.—65 S. W. (2d) 858.

Western Section.   July 29, 1932.

Petition for Certiorari denied by Supreme Court, June 24, 1933.

Ross & Ballew, of Savannah, for appellants.
Morrison & Morrison, of Lawrenceburg, for appellee.

SENTER, J.   Prior to and on the 13th day of March, 1919, the the complainant, G. T. Hughes, was the owner of approximately 16,000 acres of timber land located in Hardin county, Tennessee. These lands consisted of several tracts adjoining, and extended to the Alabama line.   On the 13th day of March, 1919, complainant, G. T. Hughes, conveyed to the defendant Hubert F. Young all of this land, aggregating 15,906¾ acres, at the price of $10 per acre. $30,000 of this consideration was paid in cash, and Young executed two separate notes for the balance. one for the sum of $5,000, due September 1, 1919, with interest from date, and one note for the sum of $124,067, due and payable on or before the 1st day of September, 1933, with interest from September 1, 1919, at the rate of six per cent per annum, interest payable annually on the first day of January of each year, with the further provision that in the event of the failure of Young to pay each annual installment of interest when due, such installment should bear interest from maturity until paid. A lien was retained on all the land to secure the payment of said notes.   This conveyance was in the form of a contract signed by both parties.   The land was principally valuable for the timber thereon, and certain provisions were made in the instrument for liens and certain agreements set out in the instrument and provisions made

with reference to the cutting and removing the timber from the land, so as to better secure and more fully protect and preserve the rights of complainant, Hughes, in the premises.

Young having made default in meeting the payments as provided in the instrument of conveyance, the complainant filed the original bill in this cause to recover the amount alleged to be due and owing to him under and by virtue of the agreements contained in said conveyance, and certain subsequent contracts and agreements, and to enforce his lien by a sale of the land described in the bill. The original bill makes numerous other parties defendants for the purposes set out in the bill, but it is only necessary to refer to the defendant Hubert F. Young, the Indiana Tie Company, a foreign corporation, with its main offices and place of business in Evansville, Indiana, the Tennessee State Lumber Company, a corporation organized under the laws of the State of Tennessee, and the Chicago Lumber & Coal Company, also a foreign corporation, and having its main office in St. Louis.

The defendant Young did not file an answer to the original bill, and judgment pro confesso was taken and entered against him, and a decree for the amounts shown to be due and owing by said defendant to complainant, including interest and solicitor's fees, and also an order of sale for the enforcement of the lien.

The Chicago Lumber & Coal Company filed an answer. The original bill charged that complainant is entitled to recover from this defendant the sum of $8,391.50 for lumber manufactured from timber cut from the Hughes tract and purchased by this defendant from Young. By its answer this defendant denied any liability whatever to complainant and averred that it did not purchase any of the lumber coming from the Hughes land. The answer states that the Chicago Lumber & Coal Company entered into a contract with defendant Young, by the terms and provisions of which it became the sole selling agent of said defendant Young, and was to receive as compensation commissions at the rate of $2 per thousand feet of all lumber sold by it for Young. The answer further avers that it made advances to Young at the rate of $15 per thousand feet, and that these advancements were made by it to Young to enable Young to operate the milling plant and to saw the lumber, and advancements so made to be secured by chattel mortgages covering the lumber so cut at the mills located at Waterloo, Alabama. This contract between Young and the Chicago Lumber & Coal Company was entered into on May 26, 1923. The answer also denies that it was indebted to Young, but averred that it had fully paid to Young the full amounts realized by it from the sale of all lumber after deducting freight charges and the $2 per thousand commission on the sales.

Certain portions of the voluminous record apply solely to the claim

of complainant against the defendant Chicago Lumber & Coal Company. In fact, there were three separate and distinct judgments against the three defendants not including the judgment by default against defendant Young, and each of these judgments and the decree of the chancellor with reference to the claim of complainant against the Chicago Lumber & Coal Company, the Indiana Tie Company, and the Tennessee Lumber Company, grow out of different facts and transactions.

The Tennessee Lumber Company, against whom a judgment was decreed for the sum of about $1,500, did not appeal from the decree, and hence that matter is not before the court for determination or review, except as the transactions between Young and the Tennessee Lumber Company, and between the Tennessee Lumber Company and the Chicago Lumber & Coal Company may shed light upon the controversy between complainant and the Chicago Lumber & Coal Company.

Hence, it becomes necessary to consider the assignments of error of the respective appellants separately. We will first dispose of the assignments of error made by the Chicago Lumber & Coal Company, and which defendant we will hereinafter refer to for the sake of brevity as the Chicago Company.

This defendant prayed an appeal from the decree rendered against it, but did not perfect the appeal. However, the defendant Indiana Tie Company prayed and was granted an appeal from so much of the decree of the chancellor as was adverse to that defendant, and its appeal was duly perfected to this court. Subsequently, and after the transcript of the record had been filed by the defendant Indiana Tie Company on its appeal to this court, the Chicago Company filed assignments of error to so much of the decree as was adverse to it. Whereupon, the complainant moved to strike the assignments of error because the record had not been filed by this defendant, and no bond had been executed by it. It was the contention of the Chicago Company that, since the transcript of the record had been filed in this court by the defendant Indiana Tie Company, that it was entitled to also assign errors without filing a second transcript and without giving bond. This contention was resisted by appellee on the ground that the appeal of the Indiana Tie Company was a special and not a general appeal. Whereupon, the Chicago Company filed a petition for writ of error, and executed bond in the sum of $750 to cover the cost of the transcript and the cost incident thereto, and with the prayer that, since the entire record of the lower court was now on file in this court, that it was unnecessary that a second transcript of the record be filed, and also prayed that the assignments of error heretofore filed by it, and the briefs and argument in support thereof be treated and considered as filed in support of its writ of error. We see no objection to this, and the assignments of error

by this defendant will be accordingly considered. At the hearing of the cause, the chancellor filed an elaborate finding of the facts and an opinion with special reference to each of the defendants affected by the decree. The chancellor held and so decreed that notwithstanding the wording of the contract between Young and the Chicago Company, and wherein it was specifically stated that the Chicago Company was but the sales agent to sell the manufactured lumber for Young on a commission basis, that it was, in fact, the purchaser of the lumber, and made the advances on the lumber and took chattel mortgages to recover the advances as made. The chancellor also found that the Chicago Company and Young had had other dealings and transactions, and that Young was indebted to the Chicago Company on account of these other transactions prior to its contract involved in this suit, and that the Chicago Company was attempting to collect its former debt and to cover up its subsequent transactions with Young. That chancellor further held that the Chicago Company knew of the lien or liens and agreements between Young and complainant, and especially with reference to the liens retained in the deed from Hughes to Young on the timber and lands from which the timber was cut and manufactured and sold by this defendant, and also had constructive knowledge that the conveyance from Hughes to Young contained a specific provision to the effect that Hughes was to receive $2 per thousand feet on all lumber cut from the land, and that he was to have a lien on the manufactured lumber for that amount, and which amount was to be applied to the purchase money notes given by Young to Hughes in the purchase of the land and timber. The chancellor further held that by selling and disposing of the lumber without paying to complainant the $2 and $2.50, respectively, per thousand feet of the lumber cut and sawed, that it was liable for the amount that the account showed to be due to complainant on such lumber so cut and sold and that this sum was directly reflected in the statement of the auditors made to Young, and furnished by Young to complainant, the amount being $8,369.30 for timber cut, but not paid for up to the time the defendant Young ceased to cut timber from the land in controversy, and decreed a judgment against the defendant Chicago Lumber & Coal Company for said sum of $8,369.30. The judgment being in the following words, and conditioned as therein set out:

"And it is further ordered, adjudged and decreed by the court that the complainant have and recover of the defendant, Chicago Lumber & Coal Co., said sum of $8,369.30, for timber cut and removal from said land by Hubert F. Young, and converted by the said Hubert F. Young and said Chicago Lumber & Coal Co., and not paid for nor accounted for, to complainant, together with the cost of the cause incident to the litigation between complainant and said defendant over this matter, but it is further ordered, adjudged and

decreed by the court that the collection of this judgment over against said Chicago Lumber & Coal Co., be and the same is hereby stayed until it is ascertained whether the proceeds of sale of said lands shall be sufficient to pay the amount owing by defendant Hubert F. Young, to complainant, with interest and cost, and if such proceeds shall be sufficient therefor, then this judgment over shall be deemed and decreed satisfied; but if the proceeds of sale are insufficient to pay said amounts owing by defendant Hubert F. Young to complainant with interest and costs, then this judgment over shall remain in full force and effect, to the amount of the deficiency, the same however not to exceed said amount of $8,369.30, and execution shall issue therefor and for costs as at law.''

By the first three assignments of error by this defendant, it is said that the chancellor erred in holding and decreeing that this defendant was liable for a conversion or otherwise to complainant for the sum of $8,369.30 and the costs incident to this branch of the case; and that the chancellor erred in not dismissing the bill as to the Chicago Lumber & Coal Company; and that it was error of the court to render any decree against this defendant, for any amount, on any account, either as a present judgment or a judgment over.

By the fourth assignment of error it is said that the court erred in not sustaining the exceptions of this defendant to ''Boyd's Audit'' or report filed as an exhibit to the original bill because hearsay and incompetent, purely ex parte, neither the auditor nor any person connected therewith, or having knowledge thereof, testifying thereto. By the fifth and last assignment the action of the chancellor in permitting complainant to amend the bill, by alleging that defendant Young was insolvent, and that the lands sought to be sold were not of sufficient value to satisfy the indebtedness of complainant against Young, and that the disposition by appellant of the lumber manufactured from timber from the lands reduced the security of complainant in the amount claimed against complainant. Because said amendment was not seasonably filed or offered, in that it was not offered until after the cause had been heard by the court on the record and the brief of appellant filed.

The first three assignments of error may be considered and disposed of together, as they present the same question.

It appears that in the conveyance executed by Hughes to Young of this 15,906 acres of land, situated in Hardin county, Tennessee, and which extended to the Alabama-Tennessee State line, and including several different parcels all connected, that an express vendor's lien was retained on the tract of land conveyed to secure the payment of the $5,000 note and the $124,067.50 note representing the deferred payment, and the interest. The deed was in the nature of an indenture signed by Hughes and wife and also by Young and was duly recorded in the register's office of Hardin county, Tennessee. In

addition to the specific lien retained, there was inserted in the deed a provision authorizing the purchaser Young to sell, cut, and remove the timber from the land upon certain conditions, and also to sell the land upon certain conditions. The provision being as follows:

"Inasmuch as said Young will want to establish sawmills on said land and cut and remove the timber therefrom, it is agreed that he may do so upon the following terms. Said Young will pay to said Hughes or assigns, at the rate of $2 per thousand feet log measure for all timber cut from said lands, whether by himself or by others for his account, payments to be made therefor every three months on the 10th day of the month, for all timber cut and removed from the land or sawed or stacked upon the lumber yards during the previous three months, or at the option of said Young, the time for such payments may be extended for a period of not more than ninety days, and the said Young will render to complainant on the last day of each third month, that is to say, on the last day of each quarter, a true and correct account of all timber cut and removed from or stacked upon the lumber yards of said Young, or others sawing on his account, whether the same be upon the lands purchased from the said George T. Hughes, or other lands used by said Young, and will furnish to said Hughes further a statement of his payroll and mill books showing the amount of logs cut and statement of invoices showing the amount of logs sold or sawed and manufactured and where the same are located, and said Hughes, his agents or attorneys, shall have the right and be allowed to inspect the books of said Young or others cutting timber on his account at all reasonable hours, and also to inspect the logs cut or lumber manufactured, and the said Young will cause to be executed to said George T. Hughes his obligation together with the obligation of some responsible guaranty company authorized to do business and doing business in the State of Tennessee in the sum of $10,000, conditioned that the said Hubert F. Young will render such true accounts and statements as hereinabove set forth.

"The amount to be derived from said $2 per thousand feet is to be applied first, to the payment of said note of $5,000, and when that is paid off, the balance will be applied to the payment of the principal of purchase money remaining due on the note, that is to say, the note for $124,067.50, it being the understanding that the interest on said indebtedness shall be paid from other sources, or from the profits arising from the sale of the lumber over and above the sum of $2 per thousand feet.

"To secure the payment of said sum of $2 per thousand feet the said Young will keep on hand either upon his lumber yards on the lands purchased from said Hughes, or other lands used and occupied by him or others on his account, an amount of timber manufactured into lumber of the average quality produced by his mill, which shall

be equal in the amount of such timber to 50 per cent of the amount of timber sawed by him and sold, but not paid for, that is to say, the quantity of manufactured lumber kept on hand not in value, but in quantity, must be equal to 50 per cent of the amount of timber or lumber sold and not paid for, and a lien is expressly retained upon the quantity sawed and kept on hand until the purchase price for that which has been sold is paid, and in the event of the failur' of said Young to pay for said timber within ninety days after the same has been matured, or shall fail to make returns to said Hughes of the correct amount of timber as hereinabove specified, then said Young will cease to cut the timber from said land until all timber cut has been paid for and until reports have been made.''

We will digress here to refer to the transactions between Young and Indiana Tie Company, but not for the purpose of considering the assignments of error of that appellant, but for the purpose of referring to a railroad that was built by Young from Waterloo, Alabama, on the Tennessee River, that extended into the lands in Hardin county, Tennessee, sold by complainant to Young. Under certain contracts and agreements, the Indiana Tie Company financed Young to the amount of $20,000, to be used in the construction of this timber railroad, and the equipment for the railroad. This railroad was built from Waterloo, Alabama, into Hardin county, Tennessee, and into the timber lands purchased by Young from complainant, and involved in this suit. This railroad was used in transporting logs from the Hughes land to the mills of Young at Waterloo, where the timber was sawed into lumber. It was also used by the Tennessee Lumber Company for transporting logs cut from the Hughes land in Hardin county. One of the contentions made by the Chicago Company is that all of the lumber which it sold for Young under its contract with Young was shipped from Waterloo, Alabama, and sawed at the mills at Waterloo, Alabama, and stacked on the lumber yards at Waterloo, Alabama, and that this deed executed by Hughes to Young carrying the provision and liens above set out was not recorded in the State of Alabama; and the further contention that this defendant did not have either actual or constructive notice of any lien or claims of complainant, Hughes, against the timber; and the further contention that Hughes, by a special contract with Young, permitted Young to take the logs from the Hughes land, and out of Tennessee to the mills at Waterloo, where the same would be sawed into lumber, and therefore waived his lien by permitting the timber to be taken out of Hardin county, Tennessee, and into Alabama.

Among other facts as found by the chancellor, the chancellor found from all the facts and circumstances surrounding the transactions between the Chicago Company and Young, and between the Chicago Company and the Tennessee Lumber Company, that it knew that this timber from which this lumber was sawed came from the

Hughes land in Hardin county, Tennessee, and knew, or should have known, of the provisions in the deed from Hughes to Young with reference to the retained lien on the timber and lumber, and the provisions pertaining thereto as set out in the deed. In support of this finding, the chancellor refers with considerable detail to the facts and circumstances as disclosed by the record.

The chancellor refers to the contract between the Chicago Company and the State Lumber Company, which was located in Hardin county, Tennessee, and its transactions with the State Lumber Company, that was also cutting and manufacturing lumber from the Hughes land in controversy. The deposition of C. W. Reighard, the secretary and general manager of the Chicago Company, was taken, and from which it appears that at the time his company made the contract with the State Lumber Company, it caused investigation of the records to be made by a competent person to ascertain what, if any, incumbrance there might be on the lumber before making any advancements to said company. The witness further testified that the State Lumber Company executed chattel mortgages to secure the advancements made to it by the Chicago Company, and filed a large number of these chattel mortgages as Exhibits Nos. 72 to 142, inclusive, all of which were registered in Hardin county, Tennessee. He stated that his contract with the Tennessee Lumber Company, for the sale of the lumber, was similar to the contract made with Young. We think it therefore clear that in investigating the records of Hardin county, before making advancements to the Tennessee Lumber Company, to ascertain if there were liens of record, that the investigation so made would necessarily disclose the deed from Hughes to Young and the lien provisions contained in the deed which was of record in the register's office of Hardin county, Tennessee. We are also of the opinion that the chancellor correctly held and found the facts to be that the Chicago Company certainly knew something of the financial condition of Young, to whom it was making the advancements on the lumber cut by Young. Certainly some inquiry was made as to where Young was procuring the timber from which this lumber was cut. The witness C. W. Reighard, who alone testifies for this appellant, does not claim that he was ever at Waterloo but one time. Certainly this appellant had other representatives at Waterloo during all the time this lumber was being cut by Young and sold by the Chicago Company. This was necessary in order that the inspections be made as provided in its contract with Young, and also with reference to the taking of the chattel mortgages from time to time on the lumber. The fact that Reighard did not have personal knowledge as to where the timber was coming from, even if he did not have such knowledge, would not warrant the conclusion that his company did not have the knowledge through other of its agents and representatives who were there at Waterloo

from time to time making the inspections and taking the chattel mortgages. The chancellor, in his finding of the facts and in his opinion filed with the record, goes very fully into an analysis of the evidence bearing upon this subject, and, after a careful review of the evidence and the record, we fully concur in the conclusion reached by the chancellor that this appellant, the Chicago Company, had knowledge of, or should have had knowledge, that the lumber sawed by Young and sold by Young and this appellant was cut from the Hughes land and brought to Waterloo by the railroad which extended from Waterloo, Alabama, into Hardin county, Tennessee, and into the lands purchased by Young from Hughes. It would but prolong, unnecessarily, this opinion to make further detailed reference to the facts disclosed by the record in support of this conclusion reached by the chancellor, and in which we fully concur. A reference to the finding of the facts by the chancellor we think is sufficient, and which is filed with the record.

This brings us to a consideration of the relation that existed between Young and this appellant, the Chicago Company, under its contract and dealings with Young. The contract is as follows:

"This agreement, made this 26th day of May, 1923, between Hubert F. Young, doing business as Hubert F. Young Lumber & Land Company, of Corinth, Mississippi, hereinafter called first party, and Chicago Lumber & Coal Company, a corporation organized under the laws of Delaware, with its principal office in St. Louis, Missouri, hereinafter called second party.

"Witnesseth

"First party is engaged in the business of purchasing the lumber manufactured by the Stringfellow Lumber Company at its mill at Waterloo, in Lauderdale County, Alabama, which said mill is owned by the Stringfellow Lumber Company, and the parties are desirous of entering into an agreement with each for the sale of the entire output of said mill by the second party as sales agent for the first party, and for advances by the second party on the lumber pending its sale and shipment.

"Now, therefore, the parties agree as follows:

"Sales Agency and Period: Second party is named and appointed sole and exclusive sales agent for all lumber now on hand at the aforesaid mill, and all lumber produced thereat between this date and May 26, 1926.

"Compensation: For its services in marketing the lumber second party is to receive a commission of two dollars ($2.00) per thousand of the sales price of all common lumber, and a commission of three dollars ($3.00) per thousand of the sales price of all lumber better than common, after deducting freight and allowances.

"Handling the Business: Second party shall be the exclusive judge of market conditions, prices to be asked, and the time the lumber

shall be sold, and will take orders from the trade, send them to first party to be filled, and the lumber will be shipped to the purchaser in the name of the second party. Second party will bill the lumber to the purchaser, and collect the proceeds, remitting first party once each month after deducting advances, with interest, allowances, freight expenses, and compensation, as herein provided, less two per cent (2%) for cash. All lumber is to be graded and shipped in accordance with the rules of Southern Pine Association.

"First party agrees to guarantee its grade and tallies on all lumber shipped on the orders of the second party. Second party shall refuse, adjust or allow the claims of purchasers, and its decision shall be conclusive, and any allowances made by it shall be charged the first party, and shall be paid by first party to second party in cash.

"Second party guarantees the solvency of its customers.

"Care of Lumber: All lumber is to be properly piled by first party on foundations and kept covered against the elements.

"Insurance: First party agrees to keep the lumber adequately insured against loss by fire, loss payable to the second party as its interest may appear, underwriters and policy forms to be subject to approval of second party. In case the first party fails to do so, second party may insure the lumber and first party will refund the amount so expended for premiums.

"Advances on Lumber: Second party will estimate all lumber at the mill aforesaid, and twice each month estimate the lumber produced at said mill during the previous period. On the lumber so estimated, second party will advance fifteen dollars ($15.00) per thousand feet, board measure, on No. 2 common and better, excluding mill culls and red heart lumber.

"Second party will advance six dollars ($6.00) per thousand on logs delivered at logging railroad of first party up to four hundred thousand feet (400,000'). Said advances to be deducted, however, from the fifteen dollars ($15.00) per thousand advances herein provided for when said logs are manufactured into lumber.

"No advances shall be made on lumber or logs not properly piled and protected or subject to attachment laborers liens, or any adverse claim, and first party guarantees that all logs or lumber upon which advances are made shall be free from all liens or adverse claims of any nature whatsoever.

"For the purpose of the advance, the estimate of the representative of the second party shall be conclusive; and to protect against errors and depreciation a deduction of ten per cent (10%) shall be made from the estimate of the amount of advances.

"The aggregate amount of the outstanding advances shall at no time exceed $45,000.

"Interest on all advances shall be paid at the rate of seven per cent (7%) per annum. If requested by the second party, advances

shall be evidenced by promissory note of the first party executed and dated at the time of the advance, payable three (3) months thereafter.

"Security for Advances: To afford security for the second party for the indebtedness to arise hereunder, first party agrees to execute, simultaneously with this contract, a chattel mortgage on all of the lumber now at or upon the yards of the mill aforesaid, and all lumber produced thereat as the natural product of the business of said mill between this date and May 26, 1926. As semi-monthly estimates are made on the lumber, and advances are made on same, as herein provided, first party is to give a separate chattel mortgage on the specific lumber as additional security for the advances made thereunder.

"All of the aforesaid chattel mortgages are to be in form satisfactory to the second party or its attorneys."

The above contract was signed by Hubert F. Young, doing business as Hubert F. Young Lumber & Land Company, first party, and by Chicago Lumber & Coal Company, by C. I. Millard, president, as second party.

Under the above contract it is contended by this appellant that it is purely a sales agency contract, and that the relation between Young and the Chicago Company was that of sales agent, or a factor.

There is a distinction recognized by the authorities between a broker and a factor or commission merchant. In volume 2, Bouvier Law Dictionary, page 1176, the definition of a factor or commission merchant is given as follows: "An agent employed to sell goods or merchandise consigned or delivered to him, by or for his principal, for a compensation, commonly called factorage or commission." "An agent for the sale of goods in his possession or consigned to him."

"A factor or commission merchant is one who has the actual or technical possession of goods or wares of another for sale. While a merchandise broker is one who negotiates the sale of merchandise without having it in his possession or control. He is simply an agent with very limited powers."

The same authority further says: "A factor is entrusted with possession, management, disposal and control of the goods to be bought and sold, and has a special property and a lien on them. The broker on the contrary, has usually no such possession, management, control or disposal of the goods, nor any special property or lien."

Again: "Brokers distinguished from factors, though governed in many respects by the same principles as the law of agency, the position of a factor is so essentially different from that of a broker that the contracts are readily discernible, and there is no danger of confusing the two callings if the difference between the respective functions they are designed to discharge is but kept in mind. The sole function of the broker is the negotiation of contract in behalf of others, and the duties of his position require him to deal merely with

the contracting parties rather than with the property to which the contract relates. A factor on the other hand does not merely negotiate the contract of sale or purchase, but is in duty bound to carry it through to performance in behalf of his principal. This necessitates his dealing not only with the parties to the contract but with the subject-matter of the contract as well. . . . The difference between the powers of the two agents is as marked as that between the functions they are designed to discharge, a broker being a mere intermediary between his principal, and the other contracting party for the purpose of effecting a contract, whereas a factor not only contracts but carries it to completion in behalf of his principal. Obviously it is the nature of the duties assumed and not the appellation by which an agent styles himself that determines into which class his agency falls." 4 R. C. L., 243, 244, sec. 3.

In 11 R. C. L., in discussing the subject of "factors," it is said: "And in a general way it may be said that the factor must carry on the business as a trade."

Applying these definitions given and the distinctions made, the above contract is in many respects that of a factor, while in other respects it is that of a sales agent or broker. The Chicago Company was a dealer in lumber, and also acted as sales agent in a large percentage of its business. But it does not appear that it was engaged in the general business of factoring, or a commission merchant.

It is to be observed that under the above contract the Chicago Company had absolute control of the matter of selling all the lumber produced by Young at the mill and that Young had absolutely nothing to do with the sale. The Chicago Company, by the terms of the contract, was given exclusive right to select the customers, to fix the price at which the lumber was to be sold, to bill the lumber in its name to the purchaser, pay the freight and other charges, collect the bills, to make all adjustments, and to be the exclusive judge as to whether the lumber was up to grade, and Young to have no voice. The Chicago Company was to receive $2 per thousand feet as its compensation on No. 2 common, and $3 per thousand on grades above No. 2 common. All Young had to do under the contract was to get out the logs, take them to the mill on his own railroad, and saw the logs into lumber. He did not even reserve the right to estimate the lumber, this was left exclusively to the representatives of the Chicago Company, as was also the matter of inspecting and grading. Under other provisions of the contract, the Chicago Company was to advance to Young $15 per thousand for lumber cut and stacked, and $6 per thousand for logs cut and delivered to the railroad owned and operated by Young, and as security for the advances made on logs and lumber, each two weeks would take chattel mortgages. When the lumber was sold by the Chicago Company, it was authorized by the contract to deduct the amount of the advances, the

freight and carrying charges, and its $2 or $3 per thousand commissions, and to account for and remit to Young any balance remaining. If the course of dealing between the parties during the period of the contract was conducted according to the provisions of the contract, we think the relation between Young and the Chicago Company was that of a del credere factor. 25 C. J., 341, sec. 2.

If, however, the course of dealing between the parties under the contract was intended to merely ostensibly but not really, be that of factor and principal, but in reality of seller and purchaser, then the true relationship would govern, regardless of the terms of the contract.

Appellee contends that the Chicago Company was engaged in dealing in lumber; that it knew that Young had but limited financial means to conduct an extensive lumber manufacturing business; that under the facts as disclosed by the record, it also knew that Young had acquired from Hughes this large body of timber land; and that he had built a railroad from Waterloo, Alabama, into this timber tract so that the timber cut from the timber tract could be logged to the railroad and carried to the mill at Waterloo, where it would be sawed into lumber. That it was desirous of procuring this lumber and entered into the contract with Young, and financed Young in the logging and manufacture of this timber. Young does not testify as a witness in the case, and the only witness for the Chicago Company is its secretary, C. W. Reighard. A significant fact in the record is the contract which the Chicago Company had with the Tennessee Lumber Company, and which contract is practically identical with the contract with Young. Mr. Hogg, president and general manager of the Tennessee Lumber Company, and who signed the contract for the Tennessee Lumber Company, with the Chicago Company, and which contract contained the identical provisions with reference to creating the Chicago Company its sole and exclusive sales agent, and also with reference to advances to be made on logs and lumber, testified that he understood that his company was selling its output of lumber under the contract, to the Chicago Company. On this subject he was asked and answered as follows:

"Q. Did you sell to the Chicago Lumber & Coal Co.? A. Our entire product is sold to the Chicago Lumber & Coal Co., except what little is retailed locally.

"Q. And you understood you were selling to them? A. Yes, sir."

The chancellor, in his finding of the facts, and who made a careful examination and analysis of all the evidence, including the exhibits, refers to certain exhibits to the deposition of Mr. Reighard, and points out certain patent discrepancies. On this subject he states as follows:

"He also exhibits with his said deposition, exhibit No. 71 as what he claims to be 'a complete record,' of each and every sale and shipment of the Young Lumber Company (Q. 59 and ans.). This exhibit

of ten sheets of letter paper attached together, having in separate columns the number of the order, and initial of cars, the date of the invoice, the estimated freight charges and number of feet. . . . It must therefore be assumed that this 'complete statement' furnishes the basis of final settlement with Young. From an inspection and comparison of these two exhibits, it is shown that of the seven cars for which bills of lading are filed (Exhibit No. 70), with perhaps one exception, the invoice price as shown by exhibit No. 71, is from $35 to $40 less than the invoice attached to the bills of lading, and the estimated freight charges are in excess of the freight actually paid. Take the cars 3367 bill of lading November 30, 1923, consigned by Hubert F. Young Land & Lumber Co., to Goodfellows' Lumber Co., St. Louis, Missouri, 'one car pine lumber, salesman McKee, terms Reg. 2—5—60—com., $10.00.' One car 2x4 10 to 16, etc., not over 20,000 feet. This invoice shows 20,001 feet at $28.50, $570.03, freight and expenses of $118. Exhibit No. 1 shows invoice $530, estimated freight $128, 20,001 feet. Thus it will be seen the invoice as shown in Exhibit No. 71 the 'complete record of all transactions' is $40 less than is shown by exhibit No. 70, and the paid freight $10 less than the estimated freight as shown by No. 71, and practically the same discrepancies appear as to all the cars, as far as this investigation and comparison leads.''

The chancellor makes further comment and comparison of the two exhibits 70 and 71. The Exhibit No. 71 to Reighard's deposition purports to be a complete statement of the transactions and account with Young and the Chicago Company.

Counsel for the Chicago Company in the elaborate brief filed, sharply criticizes the chancellor for basing his conclusions on these alleged discrepancies, and especially because the chancellor seemed to have treated Exhibit No. 71 to Reighard's deposition as a complete statement and record of the transaction between Young and the Chicago Company under the contract. Mr. Reighard testified with reference to Exhibit No. 71 as follows:

''Q. 59. Have you made up from your records a complete statement of each shipment, invoices, and number of feet that you, as sales agent, handled for Mr. Young from the Mill at Waterloo, Alabama? A. Yes, sir.

''Q. I have a statement which starts with 1923, starting with the date November 28, 1923, and contains ten pages with the headings, date, bill, car, invoice, est. frt., footage; is that the statement to which you refer? A. Yes, sir.

''Q. Does it show the number and date of each shipment as well as the bill, the car number, the invoice, estimated freight, and the footage of each shipment? A. Yes, sir.

''Q. 62. Will you file that statement as exhibit No. 71 to your deposition? A. Yes, sir, gladly.''

Exhibit No. 71 gives the date of each shipment of lumber, the bill, the car number, the invoice, the estimated freight, and the amount of lumber contained in each car under the head of "footage." It purports to be a full and complete statement, and was filed as such. Counsel insists that the discrepancies pointed out by the chancellor between Exhibits 70 and 71 could no doubt have been explained by the witness Reighard if his attention had been called to the same. It is argued by counsel in the brief that the attorney for complainant was present at the taking of the deposition and had opportunity to examine the two exhibits, and that he could have discovered these discrepancies and given the witness Reighard an opportunity to have explained the same. These two exhibits were filed by Mr. Reighard to his deposition as exhibits under the examination of his own attorneys, and for the purpose of showing that the Chicago Company had made full settlement with Young on each several cars of lumber shipped. It is insisted by appellant in the brief that Exhibit No. 71 does not purport to be a complete record of the transaction, but was filed by way of showing how the transactions were conducted. That was clearly true with reference to the Exhibit No. 70, but we cannot agree that Exhibit No. 71 was filed merely for the purpose of showing how the transactions were handled, nor was it called for, for that purpose. The witness was asked if he had this record, and he answered that he did, and he was requested to file it as a statement showing the complete record of each car shipped, and stating the amount of the invoice for each car, the number of feet of lumber, and the freight paid. It therefore purports to be a complete record of each shipment made. It is also shown to be inaccurate in the several instances pointed out by the chancellor. If settlement was made with Young on the basis of the statement Exhibit 71, then the settlement could not have been accurate, and these discrepancies and inaccuracies challenged the attention of the chancellor, and he made the comparison for the purpose of testing the accuracy of the statement Exhibit No. 71. Exhibit No. 70 was confined to only seven cars, and the chancellor points out that in practically all of these seven, when compared with the same shipments as shown by Exhibit 71, that excess amounts were charged to Young. If this was true as to only seven, shipments set out in Exhibit No. 70, which was intended to show the manner in which the transactions were conducted, if Exhibit No. 70 had shown each of the transactions as set out in Exhibit No. 71, it would have shown a large discrepancy and considerable inaccuracy if the same rule applied to all the shipments that appeared from the seven contained in Exhibit No. 70.

We will add that we do not understand how Mr. Reighard could have successfully explained away these very patent discrepancies in the two exhibits filed, and, if so, it should have been shown by

the witness under the examination of the attorney for the Chicago Company, who called for these exhibits from the witness.

The chancellor, further commenting, and after a further analysis of these exhibits, proceeds to state:

"I have referred to this matter somewhat in detail, because of this defendant's earnest and reiterated statement, both in the pleadings and in the proof, to the effect that this defendant had not bought any lumber from Young or from Young Lumber & Land Company, either in Tennessee or Alabama, and that it retained only the commission provided for in said contract as its only compensation, and has regularly and promptly remitted to said Young all amounts over and above said commission and expenses, and at the time of the bringing of this suit, had paid Young every penny due him."

The chancellor further states:

"By the methods employed between Young and defendant, and pursuant to the contract between them, money and property belonging to Young and liable for his debt, far in excess of any security to which this defendant was entitled, has been successfully covered up and concealed, under the pretext of securing and protecting this defendant in the advances made as sales agent. By this same method, while defendant was absolutely secure, Young's creditors could not reach his property, but the defendant was thus enabled to hold the same until such time and in such manner as a satisfactory sale thereof could be consummated, and as to this Young had absolutely no voice or authority in the matter."

To discuss and dispose of all the questions made under this voluminous record and elaborate briefs, and to enter into a detailed discussion of the evidence and the circumstances, would necessarily greatly prolong this opinion. We have examined the record, and we have carefully examined the facts as found by the chancellor. We are of the opinion that the chancellor reached the correct conclusion in his final summing up, wherein the chancellor says:

"This defendant's contention as stated, 'that as sales agent, it acted in good faith and without knowledge of any encumbrances or liens of any character,' and therefore would not be liable, may be conceded as stating the rule correctly. But if this be true, and even if the proof sustained this contention, still the complainant would be entitled to a recovery to the extent of any property or money in the hands of defendant belonging to Young at the time of the institution of this suit. On the other hand, if he was not so acting, although it had paid to the defendant Young all amounts realized from the sale of lumber by the terms of the contract, it would still be liable."

Appellant contends that the doctrine of comity does not give effect to foreign registration laws, and that the failure of Hughes to record the deed containing his lien in the State of Alabama where this timber was manufactured into lumber, and by his act in permitting

the timber to be shipped to Waterloo, Alabama, that his lien, if any, would not take priority over the claims of creditors in Alabama, and could not be enforceable against the Chicago Company, even though the Chicago Company was the purchaser, and not the agent or factor. Numerous authorities are cited in support of this proposition, among others is the case of Snyder v. Yates, 112 Tenn., 309, 79 S. W., 796, 64 L. R. A., 353, 105 Am. St. Rep., 941, and the cases collected and cited by the writer of the opinion in that case. That was a case in which one Meixsell executed a mortgage in the State of Illinois on certain mules and sawmill machinery, in Illinois at the time the mortgage was executed, to secure to Snyder a debt due him from the mortgagor. The mortgage was properly of record in the State of Illinois. Thereafter, with the knowledge and by consent of the mortgagee, the property was brought to Tennessee, and the mortgagor engaged in the stave manufacturing business in Tennessee. The mortgagee, Snyder, undertook to record the mortgage in Hickman county, Tennessee, but the registration of the mortgage was not good because of a defective certificate of acknowledgment. The mules and machinery were levied upon by execution creditors of Meixsell, for debts incurred by him while engaged in business in Hickman county, Tennessee. Snyder, the Illinois creditor, replevined the property. The question for decision in that case was whether the mortgagee's rights were superior to those of the levying creditors. It was held that the execution creditors had priority over the mortgagee.

In that case, the mortgage was executed on the property in Illinois and the mortgagee consented to the removal of the property to Tennessee. His defective registration in Tennessee of his mortgagee was held not to give constructive notice to the execution creditors, and stood in the same plight as if it had not been recorded in Tennessee. In the present case every fact and circumstance in the record tends to show that the Chicago Lumber & Coal Company had actual knowledge, or implied knowledge, of the lien retained by Hughes in the land and timber sold to Young. It certainly knew that this timber was being shipped into Waterloo, Alabama, over the timber railroad built into the Hughes tract of timber by Young. We think that the case comes within the rule of Newsum v. Hoffman, 124 Tenn., 369, 137 S. W., 490, wherein it was held that under the doctrine of comity, where a chattel mortgage was executed in a foreign state and brought to this State, without the knowledge or consent of the mortgagee, the rights of the latter were superior to a levying or attaching creditor, or an innocent purchaser from the mortgagor in the state to which the property was removed.

We do not find that Hughes ever gave permission to Young to cut and remove this timber out of the State, except upon the conditions set forth. This was not a mortgage, but an express lien retained by Hughes in the land sold to Young, including the timber,

all made in one conveyance. Provision was made for the cutting and selling of the timber by Young, and this provision was contained in the deed of conveyance. This provision was made for the purpose of protecting Hughes because the land was valuable principally for the timber on the land. The major portion of the purchase money was not due and payable until 1933, and the sale was made in 1919. If Young had been permitted to cut and remove the timber and sell the same, it would have destroyed practically all the security that Hughes had for the purchase money in this large and valuable property. In dealing with the Tennessee Lumber Company and with Hughes, the Chicago Company, we think, fully understood and knew the terms on which Young had purchased this land and timber, or could have known. It certainly knew that the timber was coming from across the Tennessee line, and off of the Hughes land, and according to the evidence of Reighard, the only investigation made to discover liens on the lumber which it was handling for Young, either as sales agent or as purchaser, was the records in Lauderdale county, Alabama. The contract goes to the point of having Young say that there are no incumbrances on the timber. We think that the chancellor found the fact to be that the Chicago Company, in entering into the contract with Young, and putting the several provisions in the contract, did so for the purpose of aiding Young, as well as itself, in getting this timber off of the Hughes land and into Alabama, for the purpose of defeating Hughes' lien. All of the facts and circumstances surrounding the dealings with the Chicago Lumber Company, both with Young and with the Tennessee Lumber Company, we think, reflect an intention upon the part of the Chicago Lumber & Coal Company to get this timber and lumber off of the Hughes land and out of Tennessee under a contract drawn for the purpose, and to defeat, in that way, the Hughes lien. It was upon this theory that the chancellor held that there was collusion between the Chicago Lumber & Coal Company and Young. We think the facts and circumstances as disclosed by this record, when all of the transactions between the parties are scrutinized, traced, and analyzed, abundantly support the conclusion reached by the chancellor.

We are also of the opinion that it was competent for the chancellor to consider the audit made exhibit to the bill and which had been furnished to complainant by Young, and which reflected the amount due to Hughes from Young on the timber cut and sawed at Waterloo, Alabama, amounting to the sum for which the chancellor gave judgment against Young with judgment over against the Chicago Lumber & Coal Company, to-wit, $8,369.30. All this lumber was handled through the Chicago Lumber & Coal Company. It was encumbered by the Hughes lien, and under the provision in Hughes' contract with Young this amount should have been paid to Hughes out of this lumber cut and sold to the Chicago Lumber & Coal Com-

pany, and applied to Young's note to Hughes. It is true the chancellor, in the decree, states that Young and the Chicago Lumber & Coal Company had converted this lumber to the prejudice of Hughes, and decreed a judgment on the theory of a conversion. But the opinion of the chancellor filed with the record sets forth fully the grounds upon which he held that the Chicago Lumber & Coal Company was liable to Hughes because of these transactions with Young. The audit which was considered by the chancellor and made an exhibit to complainant's bill, and which is made the basis of the fourth assignment of error by this appellant, was admitted for the purpose of discovering the amount which Young owed to Hughes on this particular lumber involved in this branch of the litigation. This was a statement furnished by Young to Hughes, and the judgment is primarily against Young for the amount shown to be due and owing under this statement or audit. The effect of the holding of the chancellor was that the Chicago Lumber & Coal Company would be liable to Hughes for such amount as the record showed Young to be due and owing to Hughes on this lumber. On either theory upon which the chancellor held that Hughes was entitled to a judgment over against the Chicago Lumber & Coal Company for the amount shown to be due and owing by Young to Hughes, we think it was competent for the chancellor to consider this audit and statement delivered by Young to Hughes.

The fifth assignment of error challenges the action of the chancellor in permitting complainant to amend the bill so as to allege the insolvency of Young and the insufficiency of the security which Hughes had for his debt against Young. The objection to the amendment is upon the ground that the amendment was not offered until after all of the evidence had been taken and the case submitted to be chancellor.

We do not think that this amendment is especially material, and that although it was allowed by the chancellor, it did not in any sense enter into the decree of the chancellor. The decree provides that the land shall be sold and the proceeds applied to Young's debt to Hughes. The judgment against Chicago Lumber & Coal Company is simply a judgment over, and in the event the land should sell for an amount sufficient to satisfy Young's debt to Hughes, an execution cannot issue against Chicago Lumber & Coal Company by the express terms of the decree. If the proceeds from the sale of the land satisfies Hughes' debt against Young, it satisfies the judgment over against this defendant. Hence, the amendment becomes immaterial, and could not warrant a reversal of the decree of the chancellor, even though this appellant is right in his contention that the amendment came too late.

This disposes of all the assignments of error. As above stated, this record is very voluminous, and many questions are made, and

we have not attempted to enter into a full discussion of all the evidence contained in the record.

The finding of the facts by the chancellor and the conclusions reached thereon by the chancellor, and contained in the record renders it unnecessary that we go into a fuller discussion of the facts, since we concur in the facts as found by the chancellor and in the conclusions reached by the chancellor on this branch of the case.

It results that all of the assignments of error by the appellant Chicago Lumber & Coal Company are overruled, and the decree of the chancellor as to this appellant is affirmed. The Chicago Lumber & Coal Company and sureties on the appeal bond will pay the cost incident to this branch of the appeal, which will be one-half of the costs accruing in this court, including the transcript of the record.

The Tennessee Lumber Company did not appeal from the decree rendered against it. It remains for the assignments of error of the appellant Indiana Tie Company to be considered and disposed of.

This appellant was made a defendant to the original bill filed in the cause on allegations that this defendant was claiming certain rights under a contract and trust deed to the hardwood timber on the tract; and alleging that this defendant was cutting and proposing to cut the hardwood timber on the tract, and seeking to enjoin this defendant from entering in and upon said timber lands for the purpose of cutting and removing timber therefrom; and prayed for a decree fixing the superior right of complainant in said hardwood timber on the tract over the rights claimed therein by this defendant.

The defendant Indiana Tie Company filed a demurrer to so much of the bill as sought relief against it. The demurrer was overruled, and this defendant filed its answer, and also an elaborate cross-bill. Under the cross-bill this defendant sets up and alleges that because of a certain release or instrument executed by Hughes to Young, wherein this defendant and cross-complainant was induced to enter into a contract with Young to advance to Young the sum of $20,000 to be used in the construction of a railroad from Waterloo, Alabama, into the Hughes land in Hardin county, Tennessee, and that this contract between Young and cross-complainant was conditioned upon Young procuring a release from Hughes of the lien on all the hardwood timber so that Young, as security for said advance or loan of $20,000, could execute to cross-complainant a first mortgage on the hardwood timber and a mortgage on all the land and other timber subject to Hughes' lien retained in his deed. The cross-bill alleged that, pursuant to said agreement, Young did procure from Hughes a timber deed to all the hardwood timber and a release of Hughes' lien on the hardwood manufactured from the tract, and in turn executed the trust deed to Williams, trustee, on all the hardwood timber standing on the tract or growing on the tract, and that this was a first mortgage on said hardwood timber, and also conveying

to Williams the land and all the timber on the tract subject to the Hughes lien. The cross-bill is very elaborate, and sets out with much detail the alleged facts and the execution of the contract with Young, and the advancements or loan made to Young, and the notes taken from Young payable to cross-complainant; the release deed on the hardwood timber; the construction of the railroad; the execution by Young of the trust deed to secure the $20,000 loan; the amount owing by Young to cross-complainant on the $20,000 loan originally made; and its alleged rights as the first mortgagor and first lienor of all the hardwood timber growing on the tract, as being superior to the lien of Hughes. The cross-bill further avers that the release deed executed by Hughes to Young operated to sell to Young as a separate estate all of the hardwood timber on the tract and free from the lien retained by Hughes in the deed from Hughes to Young. Young was also made a defendant to the cross-bill, and filed an answer to the cross-bill, and in which he admitted the material allegations of the cross-bill. Hughes filed an answer to the cross-bill, and by which he admitted certain of the allegations contained in the cross-bill, but denied all material allegations by which cross-complainant al'eged priority by virtue of its trust deed over the lien of Hughes, except in the matter of the manufactured ties cut from the hardwood, and claiming that the instrument which he executed to Young was intended to and only did release the lien on the manufactured hardwood, and that the consideration inducing said release was to enable Young to construct a railroad so that the timber could be marketed. The cross-bill further alleged that the release was personal to Young, and did not authorize Young to make any sale of the standing timber so as to entitle any one else to enter into and upon the land to cut and remove the timber. On the pleadings as made up between these two litigants, complainant Hughes and defendant and cross-complainant Indiana Tie Company, a considerable amount of proof was taken in the form of depositions by the respective parties. Many exhibits were filed, and a large portion of the record is devoted to this branch of the suit.

At the hearing of the cause, the chancellor determined the issues in favor of Hughes' contention, and dismissed the cross-bill in so far as it sought relief against Hughes, or to have the trust deed declared a first lien on the standing hardwood timber on the tract. The chancellor sustained the original bill of complainant Hughes on all the issues made between Hughes and the Indiana Tie Company, and held that Hughes had not released his first lien on the standing and growing timber on the tract and still held a first lien thereon; and further held that the instrument releasing the lien on the hardwood timber was personal to Young, and did not authorize Young to give a mortgage or trust deed on the standing hardwood timber that would create a superior lien to the Hughes lien retained in the deed.

The chancellor further held that the instrument executed by Hughes to Young releasing the lien was a release of the lien on the manufactured hardwood of $2 per thousand feet, and was not a sale or conveyance by Hughes to Young of the hardwood timber growing on the tract creating therein a separate estate from the freehold. The chancellor further held and decreed that the Indiana Tie Company was entitled to a judgment against Young for the amount shown by the record which Young owed to the Indiana Tie Company, and the accrued interest thereon and the attorneys' fees as provided in the note; and further decreed that the proceeds from the sale of the land under the Hughes' first lien would be applied to the Hughes debt, and any balance remaining would be paid to the Indiana Tie Company as the second lienor.

From this decree the Indiana Tie Company prayed and was granted an appeal to this court, and has perfected said appeal and has assigned errors. The appeal is from that portion of the decree only that is adverse to the claims and contentions of the Indiana Tie Company, and is therefore a special and not a general appeal from the entire decree in the cause.

The first assignment of error by this appellant is directed to the action of the chancellor in overruling and not sustaining the first, second, seventh, and eighth grounds of the demurrer. We may dispose of this assignment before referring to the other assignments of error. The demurrer, and especially the first, second, seventh, and eighth grounds thereof are based upon certain allegations in the bill and the exhibits thereto, with reference to the release of the lien by Hughes to Young, and the admissions in the bill with reference to the loan by this appellant to Young for the purpose of building the railroad. It is contended by this appellant that the bill shows on its face that complainant is not entitled to priority of lien rights as against this defendant.

We do not think that this assignment of error can be sustained. We are of the opinion that the chancellor properly overruled the demurrer of this defendant and all the grounds thereof. This appellants relies both in its answer and cross-bill on all of the questions made by the demurrer.

The second assignment of error goes to the action of the court in not overruling and sustaining the exceptions of appellant to the testimony of complainant with reference to his intentions and his construction of the two agreements filed as Exhibits Nos. 10 and 11 to the original bill, and testimony as to what Young told him that he intended to do with reference to cutting the timber himself, and also that part of the testimony of complainant in which he stated that he had expressed in his letters to Young that he would not be willing for anybody to do the cutting but Young himself. We do not think this assignment of error complies with the rules of this

court. The particular evidence complained of is not set out in the assignment of error. We are simply referred to the testimony of Hughes "Vol. 2, pp. 567-569, vol. 5, p. 1549." However, we have looked to the evidence complained of, or what we conceive to be the evidence complained of on pages 567 to 569, volume 2, of the transcript, and page 1549 of volume 5 of the transcript. We think this evidence was competent as reflecting the intention of Hughes and of Young, and when considered in the light of the contention being made as to a proper construction of the contracts and exhibits referred to. These instruments are not free from ambiguity, and the intention of the parties is not clearly fixed by the instrument in question, and the meaning of certain clauses contained in the instrument executed by Hughes to Young referred to as the release of the lien on the hardwood timber, is made the subject of the principal controversy between these two litigants. Proof aliunde is competent in so far as it sheds light upon the true meaning and intention of the instrument in question, and this rule will admit evidence of facts and circumstances and earlier negotiations with reference to the execution of the instrument in question. However, the chancellor construed this instrument in the light of all the facts and circumstances surrounding the transaction, and drew his own conclusions, irrespective of any conclusion or opinion of Hughes, and rested his decree upon the conclusions he himself drew, and not upon any construction given the instrument by Hughes or either of the other parties.

The other several assignments of error of this appellant contend: That the chancellor erred in holding and decreeing that complainant did not release his lien on the oak and other hardwood timbers on the lands conveyed by him to defendant Young, so that defendant Young could convey or transfer, by sale or mortgage, trust deed or otherwise, said oak and other hardwood timbers; that it was error to hold and decree that said release of said hardwood timbers was a personal privilege granted to defendant Young only, there being no express limitation or restriction to that effect in the instrument; that it was error in that part of the decree adjudging and decreeing that Indiana Tie Company did not acquire a lien on said oak and other hardwood timbers superior to that of complainant, by virtue of the release of the lien, and in the mortgage or trust executed by Young, to Williams, trustee, to secure the indebtedness of Young to appellant; that the court erred in holding and decreeing that complainant held a first and prior lien under his original deed to defendant Young on the oak and other hardwood timbers on said land, and that the lien of appellants on said timber was a second lien and subject to the lien of complainant; that the court erred in holding and decreeing that appellant, as a cross-complainant, did not have the right to sell said oak and hardwood timbers as a holder of a prior lien thereon, for the payment of the indebtedness found and decreed by the court

to be due to appellant by Young; that the court erred because it did not hold and decree that appellant tie company was entitled to a lien superior to that of complainant on the oak and other hardwood timbers on all of the lands conveyed by complainant to defendant Young; and that the court erred in dismissing the cross-bill of appellant insofar as it sought a decree adjudging it to hold a prior lien on the hardwood timbers, and in decreeing any of the costs against it.

It will thus be seen that these several assignments of error in reality present but one determinative question, and that is whether the instrument referred to as the release of the lien executed by Hughes to Young .should be construed as conveying to Young a separate estate in the standing timber, by releasing the lien on all of the standing hardwood timber, so as to entitle Young to make a conveyance of the same, by deed, trust deed, or mortgage that would take priority over the lien of complainant retained in the original deed from complainant to Young; and by reason thereof, and the execution of the trust deed by Young to Williams securing the notes evidencing the $20,000 loan made by the Indiana Tie Company to Young to be used in constructing the railroad into said tract, whether said trust deed gave to appellant to first lien on all the hardwood timber growing on the tract, and superior to the lien retained by Hughes in his deed to Young.

Although the record in this case, and on this branch of the case, contains several volumes, in whole or in part; and the briefs by the respective parties are elaborate, yet when reduced to the real questions involved, it is seen that this appeal really involves the question of the construction to be given the instrument executed by Hughes to Young, referred to in the record as the release of the lien, Exhibit No. 10. On this branch of the case, several pages of the finding of the facts by the chancellor are devoted to a discussion by the chancellor of the facts and circumstances leading up to the execution of this instrument, and also the contract between Young and the Indiana Tie Company, and the building of the railroad, and upon which this appellant also had a first mortgage or trust deed, and the right to operate the railroad for its own purposes in hauling timber from other lands other than the Hughes land, and this right to continue even after Young had finished cutting all of the timber from the Hughes land, and permitting other creditors to appropriate the railroad and right of way, and permitting a waste of that security by the Indiana Tie Company to its debt against Young.

It appears that on January 2, 1923, Young entered into a contract with Indiana Tie Company as a result of negotiations whereby the tie company agreed to loan, or advance, to Young the sum of $20,000, to be used by Young in constructing a railroad from Waterloo, Alabama, near the Alabama-Tennessee line, and extending into the

Hughes land in Hardin county, Tennessee, about fourteen miles in length. The tie company agreed to make this loan or advance to Hughes for said purpose, and to take his notes for the same, but upon condition that Young would obtain from Hughes a release of his lien on the hardwood timber on the tract, and the tie company to buy all of the cross-ties cut from the hardwood timber on the tract at the market price delivered by Young to it over the railroad to Waterloo, Alabama, and that one-half of the price of the ties would be paid to Young and the other one-half would be applied as credits on the notes given by Young to the tie company covering the loan. The contract between Young and the tie company recites in its preamble the purpose of the contract to the effect that Young was engaged in the business of cutting and removing from the Hughes tract of land in Hardin county and manufacturing into lumber the pine timber thereon, and being unable to do so economically without a timber or lumber railroad, and that Young had made certain arrangements for the building of said railroad from the Waterloo landing on the Tennessee river, in Alabama, extending in a northerly direction across the Alabama line and about two miles into Hardin county and into the Hughes tract of land, and that a survey had been made by Young for the purpose of building the railroad, and that Young was then engaged in the building of the railroad and needed additional funds with which to complete the construction of a railroad, and desired to borrow the same up to the amount of $20,000 from the tie company. The preamble further recites in substance that the tie company was principally interested in the business of producing, manufacturing, and selling railroad cross-ties and especially oak and other hardwood timber in both the states of Alabama and Tennessee and adjacent to or near the Hughes land, and the Waterloo landing on the Tennessee River in Alabama; and further recites that the tie company contemplated the acquisition of additional tracts of timber land in said territory, and then provides, "It would be to the mutual benefit and advantage of the said Young and said Company to work and operate their said businesses in the vicinity aforesaid in the respects hereinafter more fully set out; and has offered that the said Company would furnish the aggregate sum of twenty thousand dollars to be used and applied in the building of said railroad, and would co-operate with the said Young in the conduct and operation of the respective businesses of said Young and the said Company to the extent and in the particulars hereinafter mentioned. He, the said Young, would repay and secure the repayment of the money which the Company shall furnish for the building of said railroad, together with interest thereon at the rate of six per cent per annum from the date upon which the same shall be furnished, and until paid, and do and perform the other acts and things relating to the conduct and operation of the respective

businesses of the said Young and the Company in said territory, and more particularly hereinafter mentioned.''

The contract then sets out the mutual undertakings and obligations of the respective parties. First, that the tie company would furnish Young not exceeding $20,000 to be used solely in the building of the railroad, the same to be advanced in installments as the construction of the railroad progressed on drafts accompanied by pay rolls for labor performed, supplies, materials, etc., and to be accompanied by promissory notes executed by Young to the Indiana Tie Company. One-fourth of the amount would be payable on January 2, 1925, one-fourth on January 2, 1926, one-fourth on January 2, 1927, and one-fourth on January 2, 1928. The interest to be paid on the whole amount annually. The contract further provides that Young shall acquire a good title to the right of way on which the railroad is to be constructed and to perfect titles to such rights of way as he has already acquired, or attempted to acquire, as rapidly as possible, and that he will use proper care and caution to the end that good titles, acceptable to the attorney of the tie company, are obtained; and that he should construct over said right of way a standard gauge railroad to be substantially constructed and enduring for the use intended and contemplated by the parties. The contract then provides that Young shall procure the release of all of the oak and other hardwood timber on the Hughes tract from the vendor's lien retained in the deed thereto. It is then provided that Young shall secure the payment of the money borrowed from the tie company together with the interest in the following way:

''First, by a first and prior mortgage or lien upon all oak and other hardwood timbers on the said Hughes Tract:

''Second, by a mortgage or other lien on said Hughes tract, which shall be a second, subsequent and further lien to the vendor's lien retained in the said deed of the said Hughes tract, but prior and superior to all other liens thereon.

''Third, by a first and prior mortgage, lien, transfer or conveyance or assignment, as the said Company may elect, upon said railroad and said right of way and all spurs, lateral railroads or extensions thereof or thereto, and the right of way upon which said spurs, lateral railroad or extensions may be built;

''Fourth, by a first and prior mortgage, lien, transfer or assignment, as the said company may elect, of and to the beneficial interest which the said Young may have under a contract by and between him and the Southern Railway Co. for the leasing of the railroad rails contemplated to be used in the building of said railroad.

''Fifth, by a first and prior mortgage, lien, transfer or conveyance or assignment, as the said company may elect, of, to or upon all wharfs, depots, and dumping grounds or interest therein or rights

thereto which said Young may have or hereafter acquire in connection with the operation of his business in the locality aforesaid.

"Sixth, the application upon the indebtedness arising from the furnishing of the money which the company shall furnish hereunder of certain parts of the proceeds of sale of cross ties and other lumber taken off of the said Hughes tract as herein elsewhere more specifically mentioned."

After other provisions, the contract further provides:

"The said Young hereby agrees that as soon as practicable he will begin to cut the timber on said Hughes tract, and that he will cut all the oak and other hardwood timbers thereon as soon as it is reached in his operation in the cutting of the pine timber on said Hughes tract and shall make said oak and other hardwood timber into railroad cross ties, if the company shall desire said other hardwood timber made into railroad cross ties, and deliver said cross ties to the company on the bank of the Tennessee River at Waterloo Landing, in Waterloo, Alabama. That said Company shall, and it hereby does, agree to purchase said cross ties at the highest price which the said company shall from time to time be paying for ties of the same specifications delivered at said Waterloo Landing and shall take up and settle for said ties at least every thirty (30) days and shall pay fifty per cent (50%) thereof to the said Young and credit the remaining fifty per cent (50%) thereof upon the indebtedness owing by said Young to the said Company for said money which the said Company may furnish thereafter."

The contract makes other provisions with reference to the right of the tie company to build spur tracks to the railroad and to extend same into other timber tracts that it may own or control, and also to continue the operation of the railroad in event Young should cease to operate the railroad, and makes specific provision with reference to the right of the tie company to continue to operate the railroad after Young has cut the timber from the Hughes tract.

After this contract was entered into on January 2, 1923, Young procured from Hughes the release that is made the subject of the principal controversy in this suit. This release, or instrument referred to by the parties as the release of the lien, after certain recitals in the form of a preamble, referring to the original deed executed by Hughes to Young on March 12, 1919, conveying these lands to Young, and after referring to the fact that a lien on the land was retained to secure the unpaid balance of the purchase price, proceeds with this statement:

"Whereas, in said deed it was agreed as follows: 'To secure the payment of said sum of two dollars ($2.00) per thousand feet, the said Young will keep on hand either upon his lumber yards on the lands purchased from said Hughes or other lands used and occupied by him or others on his account, an amount of timber manufactured

into lumber of the average quality produced by his mill, which shall be equal in the amount of such timber to fifty per cent (50%) of the amount of timber sawed by him and sold, but not paid for, that is to say the quantity of manufactured lumber kept on hand not in value, but in quantity, must be equal to fifty per cent (50%) of the amount of timber or lumber sold but not paid for, and a lien is expressly retained upon the quantity sawed and kept on hand until the purchase price for that which has been sold is paid, and in the event of the failure of said Young to pay for said timber within ninety (90) days after the same has been matured, or shall fail to make returns to the said Hughes of the correct amount of timber as hereinabove specified, then said Young will cease to cut the timber from said land until all timber cut has been paid for and until reports have been made,' and

"Whereas, the parties of the first part have agreed to release to the said Hubert F. Young from the lien retained by said instrument, all of the oak and other hardwood timber now standing or hereafter grown on said land conveyed to him by said deed, and have also agreed to release to the said Hubert F. Young the lien retained in said deed on all oak and other hardwood timber now standing or hereafter grown on said land after it has been manufactured, as set out in the above quotation from said deed.

"Now, therefore, in consideration of one dollar cash in hand paid, receipt of which by the parties of the first part is hereby acknowledged, and in consideration of other good and valuable consideration, the parties of the first part do hereby grant, bargain, remise, convey, release and quit-claim unto the·said party of the second part, all the right, title, interest, claim or demand whatsoever which they may have reserved or acquired in, through or by a certain deed bearing date of the 12th day of March, 1919, and recorded in the records of the Register's Office in Hardin county, Tennessee, in Book 'TT,' at pages 406-423, to all of the oak and other hardwood timber now on the premises therein described or hereafter grown thereon."

This instrument is dated January 20, 1923. On the same date of the execution of the above release, there was a contemporaneous contract or instrument entered into between Hughes and wife on the one part, and Hubert F. Young on the other part. This instrument was not recorded. This collateral instrument or agreement refers to the execution of the original deed of March 12, 1919, and the consideration therefor, and the deferred purchase-money notes, and refers to the provision in said original deed whereby and wherein Young would want to establish saw mills on the land, and the provision that Young was to pay to Hughes $2 per thousand feet for all lumber cut from said land, and making full reference to that provision and the lien that was to be retained on the lumber sawed at the mills under the original contract, recites further:

"And, whereas, a lien was retained on said land and said lumber to secure the payment of the purchase money due upon said land, and the amount due for timber cut.

"And, Whereas, in order to enable said Young to obtain the money necessary to construct a railroad from the town of Waterloo, on the Tennessee River in a northerly direction for the distance of nine and a fraction miles, the said George T. and Millie D. Hughes executed to the said Young a release of the lien on the oak and other hardwood timber standing on said land conveyed to the said Hubert F. Young as above set out, which agreement and release is here referred to and made a part of this agreement, as though it was fully set out herein.

"Now, it is understood and agreed that the foregoing release of the lien on said oak and hardwood timber does not extend to or apply to the lien of the said George T. Hughes upon any of the other timber upon said tracts of land, or upon the land itself, all of which is to remain subject to said lien as the said release had not been executed.

"It is further agreed that it does not release the obligation of the said Young to pay at the rate of $2 per thousand for all timber cut and removed from said land nor the terms and payments for the same. It is further agreed that the said Young will pay at the rates of $2 per thousand for all of the oak or hardwood cut from said lands, either by himself or for any other parties, the same to be paid out of the proceeds of other timbers cut by said Young, or his assignee, in addition to the $2 per thousand chargeable to such timber, and also to be paid out of any excess which said Young may receive from said oak and hardwood timber in excess of the cost derived by him.

"It is further agreed that, whereas, the said Young proposes to establish or have established, a sawmill at or near the town of Waterloo for the purpose of sawing the timber from said lands embraced in said deed, that he will pay to the said George T. Hughes, at the rate of $2 per thousand for all timber sawed at said mill, or logs delivered there, whether such timber be cut from the lands purchased directly from the said George T. Hughes, or from other lands purchased by said Young, and said Young will cause to be forwarded to said George T. Hughes, at Columbia, Tennessee, a statement showing all lumber manufactured at said mill, or logs delivered there, and will make payment therefor monthly, and will pay for the same in accordance with his original contract. It is further agreed that this contract does not affect the agreement as to lumber cut under the contract with Mr. Hogg. . . ."

On March 27, 1923, Young and wife executed a trust deed to Robert R. Williams, trustee, on all of the lands conveyed to him by Hughes, under the deed of March 12, 1919, to secure the notes executed to the tie company, and the habendum clause in the trust deed

is as follows: "To have and to hold said property to the said Robert R. Williams, Trustee, and his successors in trust forever. We covenant that we are lawfully seized of the said property, have a good right to convey, and that the same is unencumbered, except for vendor's lien retained in a deed from George T. Hughes and wife to Hubert F. Young, which deed is recorded in Deed Book 'TT,' page 406-423, in the Register's Office of Hardin county, Tennessee, on May 24, 1919, and noted in Note Book 7, page 14, of the records of his office, which vendor's lien is modified by a certain instrument of partial release from George T. Hughes and wife to Hubert F. Young, which instrument of partial release was filed for record on the 24th day of January, 1923. . . ."

It will be noted that this trust deed does not undertake to convey in trust title to the hardwood timber, as a separate and distinct item from the land. The granting clause in the trust deed conveys to the trustee all of the property "hereinafter described," and is in fact a usual form of trust deed on all of the land conveyed by Hughes to Young. By recitation in the trust deed, the lien retained by Hughes is referred to as modified by the release subsequently executed by Hughes to Young. In this trust deed Young does not undertake to convey to the trustee a first lien on the hardwood timber separate from the land. The effect of the covenant clause is that it is sold subject to the lien retained by Hughes in his deed to Young, and as modified by the subsequent release.

It is contended by this appellant that the instrument referred to as the release of the lien of January 20, 1923, conveys a separate estate in the timber to Young, and separate from the land, and that Young, therefore, conveyed to Williams, trustee, all of the rights he had in the property including his title to the timber free from lien, acquired by the instrument of January 20, 1923, from Hughes, and a second lien subject alone to Hughes' first lien on the land.

We are of the opinion that this contention cannot be sustained under a proper construction to be given the lien release executed by Hughes and wife to Young of January 20, 1923. By the same clause in which the hardwood timber on the tract is released, and as a part thereof, as well as the recitation in the preamble, we think it is shown that the release is intended to apply to all manufactured hardwood, manufactured from the growing timber and standing timber (hardwood) on the Hughes tract. We are further of the opinion that the instrument in question, when taken in its entirety, is not and was not intended to be a timber deed from Hughes to Young conveying a separate estate in the timber from the land. It was evidently in the mind of Hughes that it was an arrangement by which Young could procure financial assistance in building the railroad necessary to get this timber out, and he was ready and willing to release his lien on the hardwood manufactured timber, to be

manufactured from the standing and growing timber on the tract, so that the proceeds from the sale of that timber would not be charged with his lien of $2 per thousand feet. Hughes, by the collateral agreement entered into with Young, exacted that the $2 per thousand that he was releasing from the hardwood timber would be repaid out of the sale of the other timber which would be manufactured and sold, and such other manufactured timber as Young would manufacture at his mills from any other land. We think that, when all of the facts and circumstances surrounding the transaction are considered, the release signed by Hughes and wife to Young of the lien on the hardwood was to enable him to get the financial assistance to build the railroad, and was giving him the privilege, as a personal right and privilege, to cut the hardwood timber then growing or hereafter grown on the land, and manufacture the same into ties and sell same to the Indiana Tie Company and receive therefrom the full proceeds, one-half to be applied on the debt to the tie company and the other one-half to be retained by him free from the Hughes lien. This would enable Young to pay for the cost of getting out these ties and delivering same to the tie company at Waterloo, and also to receive credit from the tie company for 50 per cent of the price of the ties on his note. We are also inclined to the opinion that the tie company must have so understood this to have been the nature of the release that Young would obtain from Hughes. In the contract between Hughes and the tie company, provision was made as to the way and manner that the hardwood timber would be cut from the tract. It would appear that it was to be cut along with the pine timber, and, as the hardwood timber and the pine timber was growing together on the same land, it was in contemplation that the pine would be cut and worked into lumber and the oak and hardwood cut and worked into cross-ties as the work of logging the timber progressed, and not that Young could, or would, go over the tract and cut out the hardwood and leave the pine. When we take into consideration the trust deed executed by Young to the tie company, or to Williams, trustee for the tie company, and the contract between Young and the tie company, and the release given by Hughes to Young, and the preambles to the respective instruments, we are of the opinion that the chancellor reached the correct conclusion in holding that the release from Hughes to Young was purely personal and was lacking in many of the essential elements of a timber deed creating a separate estate in the timber from the land. We are also of the opinion that the chancellor reached the correct conclusion in holding that the tie company did not receive any prior rights, claim, or lien to the hardwood timber on the tract superior to the lien retained by Hughes, and that under a proper construction of the instrument releasing the lien on the hardwood timber, that it was not intended to vest in Young any right to con-

vey the standing timber separate from the land, but only to release the lien from the manufactured hardwood from the timber then standing or growing or to be grown on the land.

We have carefully examined the record as it pertains to this branch of the case, and also the finding of the facts as found by the chancellor on this branch of the case. The finding of the facts by the chancellor is contained in the record. We will not further burden this opinion by a discussion of the facts further than has been made. The conclusion we reach is that the assignments of error of this appellant must be overruled, and the decree of the chancellor on this branch of the case affirmed. It results that all assignments of error by both appellants are overruled, and the decree of the chancellor as to all appellants is affirmed. The cost of this appeal will be paid by the respective appellants, and their sureties on the respective bonds. The cause is remanded to the chancery court of Hardin county for the carrying out of the decree of the chancellor.

Heiskell and Owen, JJ., concur.